OCTOBER AND NOVEMBER TERM, 1881, No. 7.

# McCarthy *et al. versus* De Armit.

1. In an action against the mayor and certain police officers of a city for alleged false imprisonment of the plaintiff, De Armit, without warrant or information, it was proven that a riot occurred in the city, during which more than twenty persons were killed, and a vast amount of property was destroyed, that for ten days the community was considered in a dangerous condition, that troops were present under the command of the governor of the State, an extra force of police was employed, and that a committee of public safety were meeting every day. A brother of the plaintiff was killed, as alleged, by the soldiers. The following morning one of the rioters shot and killed two soldiers. A few days afterward, B., a citizen, told a detective that G. had pointed out to him a man, and said, calling him by the last name of plaintiff, that he was the one who had shot the soldiers. The detective informed the mayor, who directed an investigation. The detective learned that several citizens had seen the murderer immediately after the shooting. G. told him D. could give him the information. D. was afraid to express himself, and upon being asked whether the murderer was a De Armit, replied, "You are near it." People evaded talking about it, and appeared to be in fear; but all who spoke of it said, from the reports, the man was a De Armit. These facts being reported to the mayor, he ordered the arrest of the plaintiff, who was discharged upon proof of innocence, after a confinement of three days. *Held,* that these facts constituted probable cause for the arrest.

2. In an action of trespass for false imprisonment, the act in itself is wrongful, and the burden is upon the defendant to prove that the imprisonment was by authority of law.

[McCarthy et al. v. De Armit.]

3. The question whether the facts constitute probable cause is one of law.

4. The gist of false imprisonment is unlawful detention, and the general rule is that malice will be implied from the want of probable cause, so far, at least, as to sustain the action.

5. If the sheriff, or mayor of a great city, or justice of the peace be sued for false imprisonment, made in an effort to suppress riot, or to arrest a murderer, the evidence on the part of the defendant, showing his good faith and the existence of probable cause, need not be very strong to shift the burden upon the plaintiff to establish want of probable cause and malice.

6. The action of the mayor was in his ministerial capacity.

7. In trespass all the defendants are alike guilty, and each is liable for the damages sustained without regard to the different degrees of guilt. But when exemplary damages are claimed, the jury should be instructed to assess them according to the acts of the least guilty of the defendants, and if any defendant is not liable for such damages, none should be included in the verdict.

8. Upon the cross-examination of the mayor, defendant, a question tending to show that before the riot he had publicly denounced the bringing on of the troops, is too remote, and not admissible to discredit the witness.

9. So, also, as to a question tending to show that in the opinion of a large portion of the community he had not performed his duty.

10. So, also, as to a question tending to show that the day before the arrest of the plaintiff, he had caused the arrest of another man accused of shooting the soldiers, upon the sworn information of one of the other defendants.

Smith v. Ege, 2 P. F. Smith, 419, followed.

ERROR to the Court of Common Pleas, No. 2, of *Allegheny County.*

Trespass, *vi et armis,* by Harry C. De Armit against William C. McCarthy, Solomon Coulson, Henry Jacobs, Edward Friel, C. G. McAleese, William Claire, and —— Motts, to recover damages for an alleged false imprisonment.

Judgment of *non pros.* was subsequently entered as to the defendants Claire and Motts. As to the other defendants, pleas of " not guilty, with leave, etc.," were entered.

Upon the trial in the Court below, before J. M. KIRKPATRICK, J., the following facts appeared :

The defendant, McCarthy, was, in 1877, mayor of the city of Pittsburgh, and the other defendants were police officers employed by the city, and acting under his direction. In July of that year there was a great riot in Pittsburgh, which commenced on the afternoon of Saturday, July 21st, and terminated on Sunday evening following, between eight and nine o'clock. The community surrounding Pittsburgh, inside and outside of it, was in a very dangerous condition. A committee of public safety was meeting every day. There was an extra police force on duty, paid for by the citizens, and troops, sent by the governor, were kept in the city until ten days afterward. From twenty-three to twenty-five people were murdered, and a vast amount of property was destroyed by the mob. The mob broke open gunshops and possessed themselves of weapons and cannon. In the course of an engagement between the rioters and some Philadelphia troops, on Saturday afternoon, about 5 o'clock, Jacob De Armit, a

[McCarthy *et al. v.* De Armit.]

brother of the plaintiff, was killed at the Twenty-eighth Street railroad crossing, near the upper roundhouse. The following morning two of the Philadelphia soldiers were shot and killed on Forty-ninth Street by a man whose identity was not established, but who became commonly known as " Pat, the avenger." On the night of Saturday, July 28th, the plaintiff was arrested without warrant or information, upon the charge of having committed the murder of the two soldiers, by the defendants, Coulson, McAleese, Friel, and Jacobs, who were detailed for the purpose by the chief of police, under instructions of the defendant, McCarthy.

The plaintiff, and other witnesses for him, testified at length, but in substance, to the effect that the police surrounded his house about half after twelve o'clock in the night, with much profanity and violence kicked the door off the hinges, forced him, partially dressed, into a carriage, and took him to a cell which was filthy from urinal water, and infested with bedbugs and other vermin. He remained there until Monday, when he was removed to a better cell. Monday afternoon he was brought up before JUDGE FETTERMAN, upon a writ of *habeas corpus.* At the request of the defendant, McCarthy, the hearing was postponed until the next day, when he was finally discharged. He also testified that he was not " Pat, the avenger," not concerned in the riot, did not shoot anybody, and that he spent Saturday night, the 21st, at the house of his mother, where the corpse of his brother was lying.

The defendant, McCarthy, testified in substance, *inter alia:* I had information that a De Armit had been engaged in the shooting of the soldiers; common report; anonymous letters; but I didn't act on that; the first information connecting the De Armits with it was nigher to the day of the shooting than to the day of the arrest; there were people spoke to me; I had heard of the death of the brother of the plaintiff before the arrest; I ordered the arrest of both men because I had become satisfied in my own mind, whether wrongfully or not, that one of these two men was the party who had shot the two soldiers at Forty-eighth Street; the inciting reason for making the arrest was official information I received from one of the detectives, William J. White.

On cross-examination he testified :

From the rumor that was floating in the community with regard to this man, De Armit, I personally directed Mr. White to go and investigate into it; the rumor came in two ways, from individuals and by letters; the general purport of it was that a De Armit was " Pat, the avenger ;" as to which De Armit I could not find out ; the letters were anony-

[McCarthy *et al. v.* De Armit.]

mous ; my instructions to. Mr. White were to proceed and investigate this matter ; he himself had information, which he stated to me ; he had been told that on Sunday the man who had done the shooting had been pointed out to his informant, and that the name of the man was De Armit ; after I had put Mr. White on the job the information he gave me was in substance that he went back to the party who had given the information in the first instance and ascertained where the party was likely to be found who had made the statement ; this party was found, and he was sent to another man ; we arrested both De Armits, but the size of the other was so entirely different that we were satisfied he was not the De Armit we wanted and he was discharged ; we had the information from Mr. Bostwick that Mr. Graham had pointed out a man to him on Sunday as being the party that did the shooting at Lawrenceville, and that his name was De Armit ; James Scott, a detective, told me one of them was in the habit of drinking and spreeing.

" " Question. Did you not on Friday, before the riots, in a barber shop, in the presence of a number of persons, including J. H. Reed and Charles M. Powers, denounce the bringing on of the Philadelphia soldiers, and say they were here for the purpose of shooting down common people like you and the barber you were talking to ?"

This question, for the purpose of showing to what extent the witness was actuated by the exigencies of the public situation in making this arrest.

Objected to as irrelevant and incompetent, and admitted under exception.

" Answer. I think it altogether likely that I said so.

" Q. What else was charged against you by the community at large by which you were hounded ?"

Objected to as irrelevant, incompetent, and not cross-examination. Admitted under exception.

" A. I have very good reason to believe that a large portion of the community were of the opinion that I hadn't performed my duty, of which they were mistaken, however. I may say further, that had I been allowed to have the control of this matter, if it had not been taken out of my hands, there would not have been a dollar's worth of property nor a single life lost, and that if the men who controlled this matter had been actuated by the spirit of Coleridge, who says : ' He prayeth best who loveth best both man and bird and beast,' we would not have been here lamenting the lives of twenty-three men lost.

· " Q. Will you state whether or not you did arrest or have Mr. Phillips arrested on the 27th day of July, the day before

these De Armits were arrested for shooting Philadelphia soldiers, upon the sworn information of Sol. Coulston, one of the defendants in this case? and this for the purpose of bearing upon the question of the sufficiency of the probable cause attempted to be set up by the defendant for the arrest of De Armit without a warrant."

Objected to as incompetent, irrelevant, not pertinent to the issue, and not cross-examination. Admitted under exception.

" A. Judging from this paper, which I have entire confidence in, that is a fact; this is my signature to the paper; the information was taken before me."

*William J. White* testified for the defendant: Mr. Bostwick had told me that he seen the man pointed out to him on Penn Avenue near Eleventh Street, on Sunday afternoon, that had shot those two soldiers on Forty-ninth Street. I asked him who it was, and he said it was De Armit, who had a brother killed at the round-house the night before. He told me that if I would go and see Barney Graham (Barney is a nickname), James Graham, of Lawrenceville, he could tell me more about it. I went and informed the mayor of what information I had, and he told me to go out there and investigate and see what I could find out. . . . I proceeded to Lawrenceville and went to Squire King to find out where Graham lived, and Squire King went along with me. We got information there that the gun these two soldiers had been killed with was left on Forty-fifth Street. We went down there and got the gun and the cartridge-box, and inquired of the parties there the description of the party that had done the shooting, and the direction they had taken after they gave up the gun and the cartridge-box. Was informed by Reardon, I think, who keeps a saloon there, that a party stopped in front of his house and wanted a drink and I [he?] refused to give him one, and he left his gun and cartridge-box, and went down towards the Forty-third Street bridge, down the railroad track. We then went and hunted up Mr. Graham, told him what I wanted, and he told me to go and see Michael Dale, who could give me all the information I wanted. Mr. Dale didn't give me any further information than that. The man was described to me before I went to see Graham, the appearance of the man and size. . . . He said he was a young man between twenty and twenty-five years of age; a man about 5 foot 9 inches tall; his face was black, as though he had just come off from working; had been working, and his face was all streaked with sweat, dirty. He said he was dark-complexed; he said he came from the direction of Forty-eighth Street. . . . I went to see Gra-

[McCarthy *et al. v.* De Armit.]

ham, and he directed me to Dale; I went to see Dale; I asked him if he had seen the party that shot those two men, and he said he had. He said he stopped in front of his house, corner Forty-eighth and Hatfield streets, and he either said he put the cartridge-box on or took it off, but he stood in front of his door awhile, across the street opposite to him. I asked Mr. Dale if he knew the man, and he said I don't like to say anything at the present time; I have got property here and I am afraid to express myself. I asked him if the party didn't live on Forty-eighth Street. He said he did. I asked him if his name was De Armit, and he said, "You are damn near it; I have nothing more to say," and he walked away from me. I asked him if he lived on Forty-eighth, because I knew Harry De Armit was in the Directory as living at the head of Forty-eighth Street. . . . I reported to the mayor. I also found out that the party that done the shooting came up Forty-fifth Street; came up in the direction of the railroad and captured a young soldier there, a young soldier about eighteen years of age that had strayed away from his company, and took his gun from him, threatening to kill him if he would not give it up, and I also traced him around, followed him around as far as Forty-eighth Street, and also saw parties there who had seen him during the shooting, and also went around to where Michael Dale lives, and stopped there; also stopped in front of Reardon's, on the street below, which runs parallel with Hatfield. I did not hear from any other source, or in any other way, that it was a De Armit who done the shooting. I gave the first information to the mayor the day I received it about Bostwick. I reported every evening when I came in what I found out. I found out that De Armit didn't live on the hill above Twenty-eighth Street, and he told me to try and find out where he lived, and on Saturday afternoon, I believe, I learned from Mr. Robert Hamilton, who was then clerk of the water commission, that he was an engineer on the Evergreen Railroad. That was on Saturday, I could not say whether it was in the morning or not. I reported to the mayor, and also suggested to him that being as he was living there he might have in all probability left his engine, gone up to Forty-eighth Street, done the shooting, and then went around and over the bridge, as I traced the man as coming from that direction and going in that direction, and he might be the party. He came up Forty-fifth Street, towards Penn Avenue, and down Penn Avenue to Hatfield Street and Forty-sixth, and from Forty-sixth Street down the railroad track, and gave away his gun and cartridge-box, and started down the railroad towards the Forty-third Street bridge.

William Bostwick corroborated White as to the circumstances of the interview with him.

*Michael Dale*, for the defence, testified:

" I saw the soldiers pass along. After they were passed, I saw a man coming down between the cemetery wall and the big pipe that lays along the wall, then rolled alongside of the curbstone, and when he came to the street next to the curb there, and he came to the curb, he jumped right out into the street, and the soldiers were then out probably 200 yards, and he hauled up his gun and stood there a good little bit, and a street-car came along, and the soldiers had dodged around the street-car. The road was very dusty. After the street-car had passed he dodged down on his knee, and off went the gun. After the dust cleared up you could see . . . that there were bulks of two bodies lying out there of some kind, and I went out there and examined it, and there was two soldiers shot through the head. . . . He came to this corner, corner of Kane's fence, and stopped and wiped the dust off his face, and he spoke. Some of them said, you fetched them. Then says he, I done my duty ; if some of the rest would do theirs there would be no more soldiers to go home to Philadelphia. . . . About five feet seven or eight inches,—spare-faced man. He had a mustache, but it was so dusty you could not tell the color of his hair or mustache. His hat was all over dust. He had a square leghorn hat on ; what you would call a straw hat, with a black ribbon on. The hat was very dirty, full of dust. . . . Every person where you went they put it on De Armit, because the Philadelphia soldiers had shot one of his brothers on Sunday ; but I did not know De Armit, and don't know him yet. . . . Mr. White came to where I live. . . . He asked me whether I would know the man that done the shooting. I told him if I could see the man dressed the same I would know him if there was ten thousand alongside of him. Says he, do you know De Armit ? Not that I know of, I says. Well, says he, would you know him if you would see him any place ? Not that I would know of, I says,—don't know any of the De Armits, that I know of. Says he, do you know he who done the shooting was De Armit ? I just made the reply, you are pretty close to it, from the reports."

The officers denied the violence and improper treatment while making the arrest.

The evidence was voluminous, but the above are the material portions.

Counsel for plaintiff asked the Court to charge, *inter alia* :

1. That to prevent a recovery in this action, defendants

[McCarthy *et al. v.* De Armit.]

must show probable cause for the arrest and detention of plaintiff.

10. That the probable cause to justify the arrest and detention of the plaintiff must be that which would justify any prudent and cautious man in the premises.

11. Malice in this action need not be specially proved on the part of the plaintiff.

14. The testimony for defendant, if believed, does not disclose any ground of probable cause, and the verdict should be for the plaintiff.

15. If the jury believe there were circumstances of outrage or oppression, either in the arrest of the plaintiff or his detention afterwards, by any of the defendants, the jury may give exemplary damages.

Counsel for the defendants asked the Court to charge, *inter alia:*

3. That the probable cause operating on the mind and judgment of the mayor, William C. McCarthy, does not depend upon the actual state of the case, but upon his honest and reasonable belief at the time of the arrest.

5. That in this form of action, trespass *vi et armis* for false imprisonment, the law requires substantially the same allegations, proof of malice, and want of probable cause, as in an action for malicious prosecution.

6. The same general principle which excepts judges from answering in a private action for *tort,* applies to justices of the peace.

The Court affirmed the above points of the plaintiff, refused those of the defendants except the sixth, which was affirmed, and charged the jury, *inter alia:*

" I now instruct you that your verdict must be against the defendants jointly, making no distinction, for whatever amount you may think the one most responsible and most guilty ought to pay."

These rulings and the charge were excepted to by defendants.

December 16th, 1879. Verdict for plaintiff for $2500, upon which judgment was entered.

The defendants took a writ of error, assigning as error the rulings upon the points as above, and the charge; that the charge upon the plaintiff's fourteenth point and the sixth point of defendants was contradictory; that the Court erred in taking from the jury the question of probable cause, and instructing them that under all the evidence of the case the plaintiff was entitled to recover, and the only question for the jury to determine was one of the damages; and as to the

tenth, eleventh, and twelfth assignments, the admission in evidence of the testimony excepted to.

*D. T. Watson* and *M. Swartzwelder* for plaintiffs in error.

*First.* The mayor, acting as such, is a *quasi* judicial officer, who is not responsible in a civil action for his errors of judgment, and if the arrest was ordered by him with the honest belief on his part that De Armit was concerned in the commission of the felony, he would not be liable in this action. To maintain an action against the mayor in such a case the plaintiff must prove malice. The decision of the mayor was a judicial determination of the question which the law cast upon him of whether, under all the circumstances of the case, it was his duty to make the arrest, and for an error he cannot be held responsible: Downing *v.* McFadden, 18 Penna. State, 334; Thompson *v.* Lyle, 3 W. & S., 166; Billings *v.* Russell, 23 Penna. State, 189; Iron Co. *v.* Smith, 71 Penna. State, 230; Bennett *v.* Fulmer, 49 Penna. State, 157; Donahoe *v.* Richards, 38 Maine, 379; Stewart *v.* Southard, 7 Ohio, 402.

*Second.* The proof in this case fully established the commission of a felony, and considering all the surroundings, the mayor had reasonable grounds to suspect or believe that De Armit was engaged in killing some of the Philadelphia troops: Smith *v.* Ege, 52 Penna. State, 421; Walter *v.* Sample, 1 Casey, 275; Dietz *v.* Langfitt, 13 P. F. Smith, 234; Russell *v.* Shuster, 8 W. & S., 309.

*Third.* It is not true, that in such a time of commotion and excitement, the mayor could arrest on suspicion only when and in such cases as a cautious, prudent, private citizen would consider it his duty to arrest.

*Fourth.* It was error to charge the jury that they must find against all the defendants the same measure of damages which the acts of the one most guilty would justify: Hodgson *v.* Millward, 3 Grant, 406; Clark *v.* Newsam *et al.*, 1 Exchequer, 130; Navigation Company *v.* Richards, 57 Penna. State, 142; Seely *v.* Alden, 61 Penna. State, 302; Wardrobe *v.* Stage Company, 7 Cal., 118; Railroad Company *v.* Finney, 10 Wis., 388.

*Fifth.* It was mischievous to introduce the testimony objected to, and have the jury try the mayor's general conduct during the riots, instead of the case at bar.

*S. Schoyer, Jr.*, and *West McMurray* for defendant in error.

Trespass for assault and false imprisonment needs no evidence of malice or want of probable cause: Addison on Torts, sec. 40; Chivers *v.* Savage, 5 E. & B., 697; Brandt *v.* Crad-

dock, 27 L. J. Ex., 314 ; Carey *v.* Sheets, 60 Ind., 17 ; Akin *v.* Newell, 32 Ark., 605.

Probable cause requires that there should be such a state of facts and circumstances as would induce a man of ordinary prudence and caution to believe the charge to be true : Driggs *v.* Burton, 44 Vermont, 124 ; Boyd *v.* Cross, 35 Md., 194 ; Collins *v.* Hayte, 50 Ill., 353 ; Barron *v.* Mason, 31 Vt., 189 ; Muns *v.* Dupont, 2 Wash. C. C., 463 ; Seibert *v.* Price, 5 W. & S., 439 ; Smith *v.* Ege, 52 Penna. State, 422 ; Winebiddle *v.* Porterfield, 9 Barr, 137.

The argument for the plaintiff in error as to the mayor's exemption from liability goes to the length of saying that any arrest by him or under his direction, no matter how malicious, causeless, or groundless, could be excused because he had first judicially determined upon it.

In this matter he acted as a ministerial officer, and he cannot claim exemption because he happens at other times to sit judicially : Yates *v.* Lansing, 5 Johns., 282 ; Whitcomb *v.* Cook, 39 Vermont, 585 ; Vosburgh *v.* Welch, 11 Johns., 178 ; Sullivan *v.* Jones, 2 Gray, 570 ; Briggs *v.* Wardwell, 10 Mass., 356 ; Spencer *v.* Perry, 17 Maine, 413 ; Morgan *v.* Hughes, 2 Term, 225.

Circumstances of outrage are ground for exemplary damages ; Hill *v.* Goodchild, 5 Burr, 2790 ; Mitchell *v.* Milbank, 6 Term, 199 ; Halsey *v.* Woodruff, 9 Pick., 555.

In cases of joint trespass the plaintiff may enter one joint judgment against all, assuming the largest sum assessed against any one as the damages against all : 2 Sedgwick on Damages, 614 ; Halsey *v.* Woodruff, 9 Pick., 555 ; Fuller *v.* Chamberlain, 11 Metcalf, 503 ; O'Shea *v.* Kirker 4 Bosworth, 120 ; Bell *v.* Morrison, 27 Miss, 68 ; Hair *v.* Little, 28 Ala., 236 ; Clark *v.* Bales, 15 Ark., 452.

The opinion of the Court was delivered November 21st, 1881, by TRUNKEY, J.

Prosecutions are presumed to have been properly instituted, and hence, to sustain an action for malicious prosecution, malice and want of probable cause must both concur and be proved by the plaintiff : Walter *v.* Sample, 1 Cas., 275 ; Dietz *v.* Langfitt, 13 P. F. Smith, 234.

Probable cause does not depend on the state of the case in point of fact, but upon the honest and reasonable belief of the party prosecuting. Among the numerous attempts to define it are " a reasonable ground of suspicion, supported by circumstances sufficient to warrant a cautious man in believing that the party is guilty of the offence ;" and " a deceptive appearance of guilt arising from facts and circum-

stances misapprehended or misunderstood, so far as to produce belief."

The substance of all the definitions is a reasonable ground for belief of guilt. Representations of others may be an adequate foundation for it, especially if made by those who have had opportunities for knowledge, or who have made investigation : Smith *v.* Ege, 2 P. F. Smith, 419. He who has probable cause, or, in other words, reasonable ground for belief of guilt, stands acquitted of liability : Travis *v.* Smith, 1 Barr, 234. This question must be judged by the circumstances existing at the time of the arrest for the offence charged; and it is immaterial that the prosecutor subsequently learned his mistake : Swaim *v.* Stafford, 4 Ired., 392. The belief must be that of a reasonable and prudent man, else the most baseless prosecutions would be safe. But some allowance will be made where the prosecutor is so personally injured by the offence that he could not likely draw his conclusions with the same impartiality and absence of prejudice that a person entirely disinterested would deliberately do. And all that can be required of him is that he shall act as a reasonable and prudent man would be likely to act under like circumstances : Cole *v.* Curtis, 16 Minn., 182. In Fisher *v.* Forrester, 9 Cas., 501, WOODWARD, J., said of the defendant who had commenced a prosecution which failed, doubtless he was greatly excited, and not wholly without cause; and it is not strange that he was mistaken in some particulars in recounting the events of the moment; and he was not condemned for his mistakes.

What facts and circumstances amount to probable cause is a question of law. Whether they exist in any particular case is a question of fact. Where the facts are in controversy the subject must be submitted to the jury, in which event it is the duty of the Court to instruct them what facts will constitute probable cause, and submit to them only the question of such facts. This principle is well settled. If all the evidence is insufficient to establish probable cause the Court shall so instruct the jury, for they are not at liberty to find a fact without evidence; and if the admitted facts amount to probable cause the Court should direct a verdict for the defendant, even if his malice were clearly proved.

Malice in law exists where an act is done wrongfully and designedly by one person to the injury of another. Prosecutions may be instituted and pursued with pure motives, but so regardless of the forms of law and judicial proceedings as to render the transactions illegal and malicious : Page *v.* Cushing, 38 Maine, 523. Yet something more than mere

legal or theoretical malice is requisite to sustain an action for malicious prosecution, for it must be proved as a fact. It may be inferred from the want of probable cause, and generally is, but its existence is a fact for the jury. Where it is a just and proper inference from all the facts and circumstances of the case, upon all the evidence in the cause, that the defendant was not actuated by any improper motives, but only from an honest desire to bring a supposed offender to justice, the action will not lie, because such facts and circumstances disprove that which is of the essence of the action, namely, the malice of the defendant in pressing the charge: Vanderbilt *v.* Mathis, 5 Duer, 304. When the prosecutor submits the facts to an attorney-at-law, who advises they are sufficient, and he acts thereon in good faith, such advice is often called probable cause, and is a defence to an action for malicious prosecution; but in strictness, the taking the advice of counsel and acting thereon, rebuts the inference of malice arising from the want of probable cause. The law favors honest efforts to bring the guilty to justice, and when a citizen proceeds by complaint before a magistrate, though the prosecution be unwarranted in fact, if his motives were pure he will be protected.

The foregoing principles have been brought into view because most of them apply in the pending case. This action is against the mayor and his officers for false imprisonment, and in some respects it is by no means analogous to an action for malicious prosecution, in that the presumption is that the defendant is not guilty. In this the act in itself is wrongful, and the burden is upon the defendant to prove that the imprisonment was by authority of law. The question of probable cause in trespass for false imprisonment is one of law, and upon principle there is no ground for diversity upon this point. It was so treated in Burns *v.* Erben, 40 N. Y. [Hand], 463, and in Wakely *v.* Hart, 6 Binney, 316, and is sustained by the weight of authority in this country and in England.

The fact of felony and reason for suspecting a particular person, justify his arrest by a private person. But a peace officer who arrests one upon reasonable suspicion of felony will be excused, even though it appear afterwards that in fact no felony had been committed. It may be expected that a felon will flee from justice if an opportunity is afforded him, and that if he knows he is suspected he will do what may be in his power to obliterate the evidences of his crime. In these circumstances are found forcible reasons for prompt action in his arrest. The public safety and due apprehension of criminals charged with heinous crimes imperiously

require that such arrests should be made without warrant by officers of the law. " Many an innocent man has been and may be taken up on suspicion; but the mischief and inconvenience to the public in this point of view is comparatively nothing; it is of great consequence to the police of the country:" Burns *v.* Erben, *supra;* Rohan *v.* Sawin, 5 Cush., 281; Wakely *v.* Hart, *supra;* Cooley on Torts, 174.

The gist of false imprisonment is unlawful detention, and the general rule is that malice will be inferred from the want of probable cause, so far at least as to sustain the action.

Constables and other police officers who arrest persons suspected of having committed felony, in actions for damages, should be allowed to defend upon like principles as a private person who causes an arrest by a complaint on oath; for it is the duty of these officers to make such arrests. If an officer wantonly and maliciously arrests an innocent man he ought to be liable in quite as heavy punitive damages as a private person would be for a causeless and malicious prosecution; but if without malice, and in the honest endeavor to arrest and bring a felon to justice, he takes an innocent person who was unjustly suspected, he should not suffer at all. And if the sheriff or mayor of a great city, or a justice of the peace, be sued for false imprisonment made in an effort to suppress riot, or to arrest a murderer, the evidence on the part of the defendant showing his good faith and the existence of probable cause, need not be very strong to shift the burden upon the plaintiff to establish want of probable cause and malice. It is of utmost importance that these officers act promptly and fearlessly, as well as honestly, in such circumstances.

In the order for the plaintiff's arrest the mayor acted in his ministerial capacity, not his judicial. No complaint had been made before him; he did not hear and determine. Many of the proper acts of a justice of the peace are ministerial. In the performance of these, if he wrongfully injures an individual he would be liable the same as if he were not clothed with certain judicial functions. If an officer fail to perform a ministerial duty of a purely public character, as the execution of a capital sentence, no private person would have a right of action against him. When the ministerial duty involves individual rights the case is different. If a justice of the peace, without reasonable cause, maliciously orders the arrest of a person for breach of the peace or felony, he may be compelled to answer the injured party in compensatory damages; and also exemplary, proportionate to the wantonness and oppressiveness of his conduct; otherwise, the danger from the acts of reckless officers would be

[McCarthy *et al. v.* De Armit.]

only less than the danger of holding honest and prudent officers liable in damages whenever they mistakenly arrested an innocent man. In trespass all the defendants are alike guilty; each is liable for the damages sustained, without regard to the different degrees or shares of guilt. The damages are not divisible, and the verdict should be for one amount against all the defendants for such sum as the most culpable ought to pay. This rule has few exceptions. However, when exemplary damages are claimed against a defendant his intent must be considered; two persons may be liable, one for punitive damages and the other only for compensatory, as when the plaintiff was arrested by a police officer and another, one acting in good faith, and the other maliciously, the true criterion of damages is the whole injury which the plaintiff sustained from the joint trespass. In such case, if the plaintiff means to get exemplary damages he should proceed against the party which ought to be punished in that way: Clark *v.* Newsam & Edwards, 1 Exc., 130. Under the evidence in this case the jury should have been instructed as respects exemplary damages beyond compensation for the injury done to the plaintiff, to assess them according to the acts of the most innocent of the defendants, and if any defendant was not liable for exemplary damages, none should be included in the verdict; for the question was as to the motives of the defendants.

Having expressed our opinion upon the principal questions of law raised by the assignments of error, it remains to consider whether the jury were rightly instructed to render a verdict for the plaintiff. If the defendants failed to prove probable cause, or to disprove malice, the instruction was just. On Saturday, July 21st, 1877, a riot occurred in Pittsburgh, during which more than twenty persons were killed, and a vast amount of property destroyed. For ten days the community was considered in a dangerous condition, troops were present under the command of the governor of the State, an extra force of police was employed, and a committee of public safety were meeting every day. At Forty-ninth Street, near the cemetery, on Sunday morning, two soldiers were killed. The night before a brother of the plaintiff had been killed, as alleged, by the soldiers. Within a few days Mr. Bostwick told White, a detective officer, that James Graham, on Sunday, had pointed to a man and said: "Bostwick, there goes De Armit, the man that shot those two soldiers at the cemetery." White at once informed the mayor, who directed him to investigate in the neighborhood where the men were shot. He did so, and was informed that several citizens had seen the murderer, who left his gun at the house

of Reardon immediately after the shooting. Graham told him to go to Dale, who could give him the information wanted. Dale did not like to say anything; was afraid to express himself; and in answer to the question if his name was De Armit, said: " you are near it, I have nothing more to say," and walked off. The officer found it difficult to get people to talk about it,—they evaded and appeared to be in fear; but all who said anything, said the man was a De Armit from the reports. The officer communicated what he learned to the mayor. These facts the jury could well have found, and doubtless would, had the opportunity been given. The fact of the felony is now admitted, and it was thus notorious. By law, the mayor is the chief conservator of the peace in the city of Pittsburgh. Upon the verity of the testimony, adduced by the defendants, the mayor had probable cause to suspect that the plaintiff had committed the crime. " The condition of the community during the time covered by the testimony" was material for him to consider with the fact that the citizens appeared in fear, and evaded the inquiries of the detective officer. Probably they feared the mob, or the murderer. This fact, also, would bear upon the apparent necessity of arresting both the De Armits at the same time. The facts, as they appeared at and before the giving the order for the arrest, must control in determining if there was reasonable cause. Very often appearances are not the same after the event as before.

We think the facts in this case more clearly show probable cause for the arrest than did the facts in Smith v. Ege, 2 P. F. S., 419, for the prosecution. There the prosecutor employed detectives who were informed by the neighbors that suspicion rested upon the Smith family; a girl told them one of the Smith boys had said to her he committed the murder, and a knife said to have belonged to the murdered man was found in the cabin of the boys. Upon this information complaint was made by Ege, the father and sons were arrested and committed to jail, and on a further hearing they were discharged. It was held, in an action by the father for malicious prosecution, that there was reasonable ground for the belief of the guilt of the plaintiff and his sons. Where a high crime has been committed very stringent proof is not required to establish that the prosecutor had ground for reasonable belief that a suspected party was guilty. As already seen, peace officers may arrest on suspicion of felony. A high officer, as the sheriff, may arrest a party merely suspected of a capital offence. Suspicion is not belief. Probable cause for suspicion by a prudent and reasonable man, that a party committed a high crime, may not be sufficient to induce him

to believe such party guilty. If the mayor had good reason to suspect, it was his duty to act to the end that the felon should not escape. Were the evidence insufficient to establish probable cause, and such as to warrant a finding that the defendant, as mayor of the city, without malice, and with the single purpose of bringing the murderer to a trial by due process of law, ordered the plaintiff's arrest, the fact would be for the jury. Because the plaintiff was innocent of the crime, it does not follow that the mayor was malicious. An innocent man is unfortunate when he is suspected of having committed a high crime, and is deeply injured when imprisoned upon suspicion; but he has no redress if his injury came through the proper action of a public officer while in the faithful performance of his duty.

The questions set out in the tenth, eleventh, and twelfth assignments were so foreign to the issue that they ought to have been overruled. Though asked in cross-examination, they were not admissible as tending to discredit the witness.

Judgment reversed, and *venire facias de novo* awarded.