## Cooper v. William R. Hart & Co., Appellants.

[Marked to be reported.]

*Malicious prosecution—Malice—Want of probable cause.*

To support an action for malicious prosecution, it must be shown that there was want of probable cause, and also that the defendant was actuated by malice. Both of these ingredients are essential.

*Warrant of arrest—Act of July 12, 1842—Probable cause.*

In an action for malicious prosecution founded upon a warrant of arrest under the act of July 12, 1842, where it appears that the judge, who had jurisdiction of the complaint, and who heard it upon its merits, was of

opinion that the charge was made out, and upon that opinion awarded the writ for the arrest of the plaintiff, the defendant's averment of probable cause is sustained.

Where goods were sold upon a cash-order shipment which required the price to be paid before the goods were taken into possession by the purchaser, and the goods were delivered by the carrier to the purchaser, through a mistake, and before the draft drawn for the price had been paid, and the purchaser subsequently refused to pay the draft, there was probable cause for the institution of proceedings by warrant of arrest.

Argued Jan. 2, 1892.  Appeal, No. 14, July T., 1891, by defendants, William R. Hart & Company, from judgment of C. P. No. 1, Phila. Co., June T., 1890, No. 189, on verdict for plaintiff, George P. Cooper.  Before PAXSON, C. J., STERRETT, GREEN, WILLIAMS and McCOLLUM, JJ.

Trespass for malicious prosecution.

The facts appear by the opinion of the Supreme Court.

BREGY, J., charged in part as follows:

" [For the purposes of this case I charge you that if Mr. Cooper's story is true—and it is the only story now before you —there was no probable cause on the part of the defendants to bring the action against him—that is, to issue the warrant against him.] [1] . . . .

" If you come to the conclusion that your verdict should be for the plaintiff—that there was want of probable cause—if you are satisfied from the evidence that there was malice against the plaintiff, then you will have a right to give such punitive damages as will punish the defendants for the injury and disgrace, and whatever else they may have inflicted upon the plaintiff." [2]

The defendants' point which was refused was as follows:

" That under all the evidence in the cause, the verdict of the jury should be for the defendants." [3]

Verdict and judgment for plaintiff for $10,000.  Defendants appealed.

*Errors assigned* were (1–3) instructions, as above.

*Richard C. Dale* and *John G. Johnson*, for appellants.—Probable cause is a reasonable ground of suspicion supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the person accused is guilty of the offence with which he is charged: Munns v. Dupont, 1

Amer. Lead. Cases, 213; Broad v. Ham, 5 Bingham's N. C. 722; Braveboy v. Cockfield, 2 McMullan, 270; Bacon v. Towne, 4 Cush. 238; Foshay v. Ferguson, 2 Denio, 617; Seibert v. Price, 5 Watts & Sergeant, 438; Travis v. Smith, 1 Pa. 234; Smith v. Ege, 52 Pa. 419; Cabiness v. Martin, 3 Dev. 454; Gilliford v. Windel, 108 Pa. 142; Bernar v. Dunlap, 13 Norris, 329.

It is impossible to say that there was a lack of probable cause, in view of the fact that Judge Simonton, after Cooper's story had been told to him, found that there was not only probable cause for the arrest, but that Cooper had actually committed a fraud.

The affidavits of Bertolet and of Pilling furnished to Barnes, one of the defendants, probable cause for demanding a warrant of arrest.

The testimony established the existence of probable cause at the time the warrant of the arrest was demanded.

*Edwin W. Jackson, Wendell P. Bowman* with him, for appellee. —The proceeding of Judge Simonton in issuing the warrant of arrest having been reversed by this court as irregular, the plaintiff could have recovered damages for false imprisonment; and his action at common law for this purpose would have been trespass. But as he sought to recover from the defendants for maliciously procuring the issuance of the warrant, he would at common law have been remitted to an action on the case in which it would be necessary to allege and prove malice : Allison v. Rheam, 3 S. &. R. 139; Berry v. Hamill, 12 S. & R. 210; Sommer v. Wilt, 4 S. & R. 19; Kerr v. Mount, 28 N. Y. 659; Miller v. Adams, 52 N. Y. 409.

In all cases, where it appeared that the plaintiff had been in fact innocent, and the defendant relied upon a " reasonable ground of suspicion " as affording probable cause, the circumstances upon which the suspicion was based, and the fact and manner of bringing them to the knowledge of the defendant, were shown by affirmative proof. " In general the plaintiff must give some evidence showing the absence of probable cause. But such evidence is in effect evidence of a negative, and very slight evidence of a negative is sufficient to call upon the other party to prove the affirmative, especially where the nature

of the affirmative is such as to admit of proof by witnesses:" Lord Tenterden, C. J., in Cotton v. James, 1 Barn. & Adolph., 128; s. c., 20 Eng. Com. Law Rep. 358. Mere belief is not enough, however sincerely entertained: Winebiddle v. Porterfield, 9 Pa. 137; Merriam v. Mitchell, 13 Me. 439; Galloway v. Stewart, 49 Ind. 156; Honneycut v. Freeman, 13 Iredell, 320.

The charge of the learned judge in regard to damages was clearly within the law. Gibson, C. J., delivering the opinion of the court in Pastorius v. Fisher, 1 Rawle, 27, says that in cases of personal injury damages are given not to compensate but to punish: Waterman on New Trials, vol. I, chap. XII; Voltz v. Blackmar, 64 N. Y. 440; Sommer v. Wilt, 4 S. & R. 19.

Opinion by Mr. Justice Green, March 21, 1892.

This was an action of trespass to recover damages for a malicious prosecution instituted by the defendants against the plaintiff. To sustain such an action it is necessary that two elements shall be established, without which the action fails. It must be shown that there was want of probable cause, and also that the defendants were actuated by malice. Both of these ingredients are essential and without them there is no cause of action. There is no dispute as to what the law is upon this subject. In Smith v. Ege, 52 Pa. 419, we said: "Probable cause does not depend on the actual state of the case in point of fact, but upon the honest and reasonable belief of the party prosecuting. It has been variously defined as such a suspicion as would induce a reasonable man to commence a prosecution: Cabiness v. Martin, 3 Dev. 454; or a reasonable ground of suspicion, supported by circumstances sufficient to warrant a cautious man in believing that the party is guilty of the offence: Munns v. Dupont, 3 Wash. C. C. 31; or, as in our own cases, a deceptive appearance of guilt arising from facts and circumstances misapprehended or misunderstood, as far as to produce belief: Seibert v. Price, 5 W. & S. 439, and Beach v. Wheeler, 30 Pa. 72. The substance of all these definitions is a reasonable ground for belief of guilt. It can make no difference what induces the belief, if it be reasonably sufficient. While mere floating rumors are not an adequate foundation for it, plainly, representations of others may be, and especially representations made by those who have had opportunities for knowledge, or who have made an investigation."

In Bernar v. Dunlap, 94 Pa. 329, we said: "It is well settled that to support an action for malicious prosecution, both want of probable cause for the prosecution and malice in the prosecution must be shown. Want of probable cause does not establish legal malice to be declared by the court; but it is evidence proper to submit to the jury. In an action against the prosecutor, if the plaintiff proves he was discharged by the examining magistrate, the burden of proof that there was probable cause as a general rule is cast on the defendant. If, however, the plaintiff's own testimony shows the existence of probable cause, it lifts the burden from the defendant. Such was the case here. The fact is unquestioned that the property of the defendant was stolen. The plaintiff proved by the magistrate, before whom the complaint was made, that the defendant was at his office with Mr. Curtis, that ʻCurtis said he had seen Dunlap's gauntlets in possession of Mr. Bernan; my recollection is that Curtis said they were Dunlap's gauntlets; I then recommended the complaint to be made.' It is unnecessary now to decide whether the advice of the magistrate shall have the same protective power as the advice of counsel learned in the law. The express and distinct statement of Curtis made to both prosecutor and magistrate gave probable cause." The court below had granted a nonsuit, and we sustained it.

In Gilliford v. Windel, 108 Pa. 142, Mr. Justice Gordon said, in delivering the opinion of the court: "For, as we held in Smith v. Ege, 2 P. F. Smith, 419, and Seibert v. Price, 5 W. & S. 438, the question turns not upon the actual statement of the case, but upon the honest and reasonable belief of the party prosecuting, so where it appears that the defendant acted merely through mistake, or where the prosecution resulted from the mistake of the justice of the peace, before whom the information was made, the action cannot be maintained."

Recurring now to the facts of the case, we find that the malicious prosecution complained of by the plaintiff was a proceeding by warrant of arrest, under the act of July 12, 1842, and that the allegation upon which that proceeding was founded, was, that the plaintiff had fraudulently contracted a debt for two carloads of pig iron, bought from the defendants by the firm of Cooper, Reynolds & Co., in June, 1888, of which firm the plaintiff was a member. The complaint upon which the

warrant of arrest was issued was made before Judge SIMONTON, president judge of the twelfth judicial district of this state, who granted the warrant under which the plaintiff was arrested and held in confinement until the next day, when he was released on bail.    Upon answer filed to the complaint the cause was subsequently heard before Judge SIMONTON, who, being of opinion that, under the proofs, the debt in question had been fraudulently contracted, ordered the plaintiff to be committed. Against this order a certiorari was taken out from this court, and the cause was brought before us, and, after hearing, the proceedings were reversed by this court upon the ground that the affidavit upon which the warrant was issued disclosed only a case of fraud in the subsequent breach of the contract, and not in its original making.    Upon the trial of the present case the whole of the record, and all of the proceedings and testimony before Judge SIMONTON were given in evidence, and it then appeared that the judge heard the plaintiff, who testified before him at length, giving his entire version of the facts of the transaction, but nevertheless he was of opinion that the plaintiff was guilty of the charge of having fraudulently contracted the debt in question, and for that reason ordered his commitment.    The considerations which impelled the judge to that conclusion were fully set forth in his opinion, which was given in evidence on the trial of the present case.    Neither this opinion, nor any of the testimony taken upon the hearing before Judge SIMONTON, was considered by this court, for the reason that the act of 1842 does not make provision for filing of record any of the proceedings after the warrant, and hence the certiorari brought up nothing that we could review except the affidavit and the warrant.    We expressly refused, therefore, to consider the merits of the case, holding that they were not before us.

But in an action for malicious prosecution, founded upon such a proceeding, it is entirely competent for the defendant to prove, in support of his averment of probable cause, that a judicial officer, who had jurisdiction of the complaint, and who heard it upon all its merits, was of opinion that the charge was made out, and upon that opinion awarded the writ for the arrest of the party.    Even the advice of counsel, to whom the facts have been made known by the prosecutor before proceed-

ing, is held to be sufficient to rebut a presumption of malice arising from want of probable cause.   In McCarthy v. DeArmit, 99 Pa. 63, we said: " When the prosecutor submits the facts to an attorney at law, who advises they are sufficient, and he acts thereon in good faith, such advice is often called probable cause, and is a defence to an action for malicious prosecution; but, in strictness, the taking of the advice of counsel, and acting thereon, rebuts the inference of malice arising from the want of probable cause."   In the same case we also said : " An innocent man is unfortunate when he is suspected of having committed a high crime, and is deeply injured when imprisoned upon suspicion; but he has no redress if his injury came through the proper action of a public officer while in the faithful performance of his duty."   In Emerson v. Cochran, 111 Pa. 619, we said: " In order to sustain this action, the plaintiff must not only allege in his narr, but also prove on the trial, that the defendant had not probable cause for his prosecution, and was actuated by malicious motives.   The want of probable cause without malice is not sufficient; so where probable cause appears, the motive for the prosecution, however malicious, goes for nothing. . . . Something more than mere legal or theoretical malice is requisite to sustain an action of this kind, for it must be proved as a fact, and, while it may be inferred from a want of probable cause, its existence, nevertheless, is for the jury.   From this it follows that a jury ought not to be permitted to infer malice from the mere want of probable cause, when by other circumstances it is disproved. . . . The discontinuance, and other evidence of a prima facie character, going to establish malice in the original prosecution, was, if there is any force in authority, completely rebutted by the fact, which no one pretended to gainsay, that the defendants, in good faith, acted upon the advice of counsel."

How much more is such a presumption rebutted when it is found that the writ, under which the plaintiff was arrested, was issued by a judge, who, in the lawful exercise of his judicial function, has directed it to be issued.   And how can it possibly be said that there was a want of probable cause, when it is considered that the same judge, one of the ablest and most accomplished judges in the commonwealth, after a full and patient hearing of the whole merits of the case, and after hearing

the testimony of the plaintiff himself, deliberately adjudged that the charge made by the defendants against the plaintiff was sustained, and judicially directed his commitment for that reason. Without going into the facts of the case, this one feature is a complete defence to the charge that there was no probable cause for the proceeding, and, of course, to any inference of actual malice.

If, now, we consider briefly the facts as they were developed on the trial, they tend most strongly, in our opinion, to the same conclusion. The transaction between the parties commenced by a written order from Cooper, Reynolds & Co., on the 8th of June, 1888, to Ezra Bertolet, an iron broker, to ship them two car loads of iron at prices named, with this condition as to the payment, "Draft with Bills of Lading, which will be paid as we are ready to take the iron." By the undisputed testimony, including that of the plaintiff, this was a cash order shipment, the meaning of which was that the iron was not to be removed from the cars until the price was paid. The plaintiff himself explained this. He was asked: " Q. Explain to the jury how this iron would be shipped, if shipped as a cash order shipment? A. Mr. Ezra Bertolet would have notified W. S. Pilling that he had sold Cooper, Reynolds & Co. two car loads of iron. Mr. Pilling would render a bill and get a bill of lading from the railroad company—a receipt it is sometimes called—attach that with his bill, make a draft for the amount of the bill, pin them together, and deposit them at bank in Philadelphia, and send it on to Harrisburg for collection. The banks at Harrisburg would notify me, I would call and pay the draft, take the bill of lading, deliver it to the Pennsylvania Railroad Company, who would then order the car from their yard delivered down at our works. That would be the manner of a cash order shipment. Q. To whom would the iron be consigned? A. It would be consigned to W. S. Pilling, the maker of the bill, the drawer of the draft. Q. When would you first obtain any right to have that iron delivered to you ? A. When I got possession of the bill of lading, which contains the order on the Pennsylvania Railroad Company for the delivery of the iron. That is, on payment of the draft."

The order to Mr. Bertolet was executed through Mr. Pilling, who obtained it from Hart & Co., and the iron was shipped to

Mr. Pilling, care of Cooper, Reynolds & Co., care of Lochiel Mills, Lochiel, Pa.; the bills of lading were attached by Pilling to drafts on Cooper, Reynolds & Co., for the price, and the drafts were sent by Pilling for collection through the bank, and were presented to Cooper, Reynolds & Co. on June 17th and 21st, were not paid and went to protest. The first car reached the yard of Cooper, Reynolds & Co. on June 15th, and the second on June 23d. Both were unloaded, and the iron was used in the furnaces immediately. On the 15th and 17th of June, Bertolet, by letters addressed to Cooper, Reynolds & Co., enclosing Pilling's bills for the iron, advised them of its shipment, and notified them that drafts had been drawn for the amounts due. Thus it was established, by entirely undisputed testimony, that the iron was sold upon a cash-order shipment, which required the price to be paid before the iron was taken into possession by the purchaser, and that the purchasers, being duly notified of the drafts drawn for the price, dishonored them and suffered them to be protested. As the iron was sold upon a cash-order shipment Pilling could not be expected to know, and, in fact, did not know, that Cooper, Reynolds & Co. had taken possession of it, or that they had used it. Had he, or Hart & Co., known that fact, they could have taken immediate steps to secure themselves, but, upon the supposition that the iron was still in the possession of the railroad company, the necessity for such immediate action would not be so apparent, and their claim against Cooper, Reynolds & Co., could, for the time, be safely treated as a common debt secured by the possession of the iron by the railroad company.

An examination of the correspondence which quickly ensued, and of the testimony of Cooper, shows that Pilling and Hart & Co. were lulled into, at least, a state of inaction and false security; such that the real facts of the situation were not known to them until several months later. The plaintiff was asked on the trial by his own counsel: " Q. When did you learn that the iron had been delivered? I do not mean the date, but in relation to the time of its delivery. A. Not until it had been worked up in the mill. It may have been one day afterwards, or it may have been two—I don't recollect." So that it appears he had immediate knowledge of the receipt of the iron and of its being worked up within two or three days

after it was received.   He also testified: "I didn't know positively that this was a cash-order shipment until Mr. Creveling, our agent, came to Harrisburg, which was, I think, a week after the second car had arrived.   I had a letter, or a letter had come through the mail, from Mr. Bertolet, but I can't say that I saw that letter till some days after the iron had been received."

Upon his cross-examination, after having testified that the iron of the first car load was worked up the same day it was received, and that he received Mr. Bertolet's letter, which raised the question in his mind whether it was not a cash-order shipment, about the 16th or 17th of June, that he had written to Mr. Creveling to give him the particulars of the purchase, and that he saw Creveling personally within a week or ten days after, he was asked: "Q. What was the information which you got from him?   A. That he had purchased this on a cash order.   Q. So that, under the terms of Mr. Creveling's purchase, this iron ought not to have been delivered or used until it was paid for?   A. That was the way of a cash order, yes, sir. . . . Q. You knew then, from your own standpoint, that you had gotten it by mistake?   A. Yes, sir."

The plaintiff, according to his own testimony, knew within ten days or thereabouts after the iron had been received and used, that he had received it by mistake, and that this was in contravention of his contract for the iron.   Yet he made no disclosure to Hart & Co. of the fact that he had received possession of the iron and used it up; he did not inform them that any mistake had been made in its delivery; he did not pay for the iron, but promised repeatedly by letter to pay for it, which promises he constantly violated; he permitted Hart & Co. and Pilling to remain in the belief that the iron was still in the possession of the railroad company until they discovered several months later what the real facts of the situation were. The letters of Pilling, addressed to the firm of Cooper, Reynolds & Co., disclosed to the plaintiff that Pilling was entirely ignorant of their having taken possession of the iron, and yet he permitted him to remain ignorant of that very important fact, though, from the terms of the letters, he was plainly bound to make the disclosure.   On the 17th of July, 1888, Pilling wrote to Cooper, Reynolds & Co. a very pointed letter, in which

he recounted the facts of the order and shipment, the return of the drafts unpaid, that he would be subjected to heavy loss on account of freights to be paid unless the drafts were paid, and implored them to make payment by return mail. On July 31st he wrote them again, reminding them that they had promised to pay for the iron last week, and he had, therefore, drawn another draft on them for the whole amount, which he urged them to pay promptly. On August 13th he wrote them again in the following words :

"MESSRS. COOPER, REYNOLDS & CO., Harrisburg, Pa.— Dear Sir : I am informed at bank that my draft is still unpaid, although you promised to pay it more than two weeks ago. As it seems useless to continue in this way, I think it will be best to order the iron returned to shipping place. This will, of course, net me a loss, but you do not seem disposed to accommodate me at all, and I think I have been patient in waiting now for two months for settlement. If, therefore, I do not hear from you by return mail I will order the railroad company to return the iron."

On August 23d Pilling wrote the firm again as follows : " Your draft has again come back unpaid, and your check has not reached me. I cannot have this matter go on any longer in this way, and if I am not favored with your check this week I will notify the railroad company to return the iron."

It thus appears that although more than two months had elapsed since the purchase, and although the letter of August 13th had distinctly informed them that Pilling still supposed the iron to be in the possession of the railroad company, and, therefore, safe for at least the amount of its value, they did not undeceive him in this respect, but permitted him to remain in ignorance of the truth. Even the last letter of August 23d brought no disclosure, as appears by the next letter, written to the firm by Pilling, on August 28th in which he said : "Not having received your check, as per your promise, I have been forced to the conclusion that you have no serious intention of taking the iron and paying for it. I have therefore to-day advised the railroad agent to return the iron to point of shipment." This letter also failed to elicit the truth, and it was not until the 14th of September, when he wrote them again, that we learn how the knowledge of the real facts of the case

was obtained.  On that date Pilling again wrote the firm thus:
" Not having received your check as promised, I wrote the railroad agent at Lochiel to return the two cars of iron shipped you in June.  It seems, however, that by some mistake they were delivered to you, although shipped to my order.  As I am acting in this matter as an agent for others, I have no option as to the course to be pursued.  You well know that you should not have allowed the railroad company to take your receipt, but as this has been done, you will now please reload the iron and send it back to Steelton.  I should be very sorry to take steps which will be unpleasant to you, but unless this matter is immediately settled, either in this manner or by your check, I shall institute proceedings, and will press them, even if you shall be placed in a position which I appreciate will be most embarrassing.  You have never intimated that you have had the iron, and in all of your correspondence have allowed me to remain under the impression that it was still standing on cars."

Not even this letter brought any practical results, or any explanation from the firm of the original delivery of the iron to them, though they were not entitled to it, nor of their continued and persistent withholding of the truth from Pilling and from Hart & Co.  The question on the trial of this cause was, not the guilt or innocence of Cooper in obtaining the iron, but was there probable cause for the institution of the proceeding by warrant of arrest.  What were Hart & Co. to think of the conduct of Cooper, Reynolds & Co., when they discovered that they had taken possession of the iron immediately after the shipment, and that such possession was in violation of the contract, and, therefore, unlawful.  The course of deception practiced by Cooper, Reynolds & Co., began at once, as soon as the iron was received, and persistently continued until the end, when the truth was discovered, not by any disclosure by Cooper, Reynolds & Co., but from outside sources.  Why were not Hart & Co. justified in believing, from this long course of deception, traced back to the very time of the transaction, that the debt was fraudulently contracted?  Even if Cooper did not know of the terms of the contract at the very time the iron was delivered, Hart & Co. did not know that, and the circumstances were highly persuasive to induce them to think that

he knew all about it. The order for the iron, with the cash order in it, was signed in the name of Cooper, Reynolds & Co., by their authorized agent, and the law charges the firm with the full knowledge, and, of course, Hart & Co. had the right to infer that Cooper knew all about it. In point of fact, he did know all about it in a very few days, and from the moment of his acquisition of this knowledge he suppressed the truth, concealed the real facts from them, when it was his plain legal and moral duty to make an instant disclosure, and to make restitution of the possession which he had unlawfully acquired, or else to pay for the iron. He did none of these things, but even after he knew perfectly well from the correspondence that Hart & Co. and Pilling were ignorant of the fact that he had long before taken actual possession of the iron without right, he still concealed from them this most vital and essential fact in the transaction of sale.

The decision of this court in Hart v. Cooper, 129 Pa. 297, has no relevancy to the present discussion. We determined nothing there but the technical effect of the affidavit upon which the warrant issued. The merits were not before us, and were not considered. Moreover, the present question, to wit: probable cause for the proceeding, did not, and could not, arise in that case. When the learned court below charged the jury that if they believed Cooper's story, and that there was no other, they should find for the plaintiff, they misled the jury in two ways; first, because Cooper's story was by no means the whole of the case; and second, because it was erroneous both in the estimate of the facts and in its conclusion of law. Cooper's story furnishes much of the testimony upon which the defendants were at liberty to believe that they had probable cause for instituting their proceeding, and when the oral testimony of Pilling and Bertolet, and above all, the letters which passed between the parties are considered, it is, in our judgment, very apparent that they did have the probable cause which relieves them entirely from liability in this action. When it is still further considered that the writ for the arrest of the plaintiff was issued by a judicial officer having full jurisdiction of the complaint and the parties, which, upon subsequent hearing of testimony, including that of the plaintiff in this case, was confirmed by the opinion of the judge on the merits, there is ab-

solutely no ground upon which either an allegation of want of probable cause or of malice can stand.   We are of opinion that all the assignments of error are sustained, and that, upon all the testimony in the cause, the learned court below should. have directed a verdict for the defendants.

Judgment reversed.