**Joan HAYFIELD, Plaintiff,**

v.

**HOME DEPOT U.S.A., INC. and Artistic Checks Company, Defendants.**

**No. CIV. A. 00–CV–4776.**

United States District Court, E.D. Pennsylvania.

Oct. 1, 2001.

---

William P. Coffin, Easton, PA, for Joan Hayfield.

Robert B. Lawler, Louis S. Flocco, Philadelphia, PA, for Home Depot, Inc.

John W. Ashley, Allentown, PA, for Artistic Checks Company.

## OPINION AND ORDER

VAN ANTWERPEN, District Judge.

Plaintiff Joan Hayfield ("Plaintiff") brings this case against Home Depot U.S.A., Inc. and Artistic Checks Company ("Defendants"). Plaintiff alleges malicious prosecution against Home Depot and breach of contract and negligence against Artistic. Currently we consider summary judgment motions filed by Defendants, and deny both motions, for the reasons set forth hereinafter. The case will be immediately scheduled for trial.

## I. INTRODUCTION

We have before us Defendant Home Depot's Notice of Removal, filed on September 20, 2000 ("Removal"), Answer to Complaint with Affirmative Defenses by Defendant Artistic Checks Company, filed on December 13, 2000, Answer and Separate Affirmative Defenses to Complaint by Defendant Home Depot, Inc., filed on December 15, 2000, Reply by Defendant Home Depot, Inc. to Defendant Artistic Checks Company, Inc. Crossclaim, filed on January 5, 2001, Self–Executing Disclosure by Defendant Artistic Checks Comp., filed on February 14, 2001, Motion by Defendant Home Depot, Inc. for Summary Judgment, Memorandum, ("Home Depot SJ Mot.," "Home Depot SJ Brief"), filed on July 5, 2001, Answer by Plaintiff Joan Hayfield to Motion for Summary Judgment filed by Home Depot, filed on August 9, 2001, Brief by Plaintiff Joan Hayfield in Support of Response to Motion for Summary Judgment pursuant to FRCP 56(b) ("Plaintiff's Response to Home Depot"), filed on August 9, 2001, Notice of Motion and Motion by Defendant Artistic Checks Comp. for Summary Judgment, filed on August 16, 2001, Brief by Defendant Artistic Checks Comp. in Support of Summary Judgment ("Artistic SJ Brief"), filed on August 16, 2001, Response by Defendant Home Depot, Inc. to Defendant Artistic Check's Motion for Summary Judgment, Memorandum, filed on August 27, 2001, and Plaintiff's Answer to Motion for Summary Judgment Filed by Defendant Artistic Checks Company and Memorandum ("Plaintiff's Response to Artistic"), filed on September 14, 2001.

## II. BACKGROUND

The most essential facts are undisputed. On July 13, 1999, Plaintiff made a $35.28 purchase at Home Depot, using a check which had been erroneously printed with an incorrect account number by Artistic. Artistic SJ Brief at 2–3. Plaintiff was unaware of Artistic's error at the time she executed the check. *Id.* at 6. Plaintiff sent a substitute check to Home Depot for the amount of the original check plus a returned check fee on August 22, 1999. Home Depot SJ Brief at 2,6. Home Depot, after depositing Plaintiff's substitute check on September 14, 1999, initiated criminal prosecution of Plaintiff on Octo-

ber 7, 1999 under a state law designed to combat bad check writing. *Id.* Plaintiff was acquitted at a January 21, 2000 hearing. *Id.* at 2.

The following are the details related by Plaintiff in her deposition. "Deposition of Joan Hayfield," May 3, 2001, provided as Exhibit to Artistic SJ Mot. ("Plaintiff's Depo."). Plaintiff is an unsophisticated sales representative who rearranges products on grocery shelves. Plaintiff's Depo. at 6:23–7:18. She never graduated from high school and earns just over $10 an hour. *Id.* at 7:24–8:2. She purchased checks from Defendant Artistic because she learned these checks were less expensive than her bank's checks. *Id.* at 10:12–14. Plaintiff was trying to save costs wherever possible because she had recently purchased a new house. *Id.*

When Plaintiff received her new checks in the mail on July 13, 1999, she inspected her name and address but did not notice the account number printed on the checks. *Id.* at 14:8–15:6. Plaintiff has had a 14–year relationship with her bank, the Stroehmann Credit Union, and has never felt it necessary to inspect the numbers on her checks. *Id.* at 33:5–9. During her 14 years as a Stroehmann customer, Plaintiff has never bounced a check. *Id.* at 18:22–19:1.

Plaintiff states that she "was so psyched [excited] when I got those checks, because they were my new checks in my new house, I was going to go to Home Depot and buy everything." *Id.* at 33:20–22. Plaintiff, who was a regular customer at that Home Depot store in Bethlehem, went directly to this store on July 13 and used the first of her new checks from Artistic to make $35.28 in purchases. *Id.* at 34:7–11, 37:1–9. At the time, Plaintiff had approximately $2,000 in her bank account. *Id.* at 50:3–13; 191:20–192:3.

Only later did Plaintiff discover that her checks were erroneously numbered. *Id.* at 20:7–19. She called the credit union the day after she learned one of her checks had bounced, and realized Artistic's printing error in discussion with bank personnel. *Id.* at 21:4–13, 22:2–10, 24:9–25. Plaintiff "didn't wait" to contact Artistic. *Id.* at 25:4–19. Artistic apologized, said it would reimburse Plaintiff and volunteered to send a letter explaining its error, which Plaintiff, in turn, could provide to creditors. *Id.* at 25:22–27:4. Artistic fulfilled these promises. *Id.* Plaintiff contacted all of the creditors, including Home Depot, to whom she had written checks, explaining the situation and offering to make an effective payment. *Id.* at 45:20–46:5. The Home Depot representative on the phone indicated that it would be acceptable for Plaintiff to return to the store to clear her debt. *Id.* at 47:18–48:12

On or about August 22, 1999, before Home Depot began its prosecution, Plaintiff drove one hour to the store where she had made her purchases, intending to make a substitute payment using an old, valid check issued by her credit union before she received Artistic's checks. *Id.* at 45:13–16; 185:16–185:25. Plaintiff states that she planned to show Home Depot officials her good checks and those issued by Artistic, adding, "I had my license with me, my registration with me, my company car information with me, everything, to show these people that I was not trying to rip them off." *Id.* at 48:7–12.

Plaintiff was told that Home Depot would not accept another check. *Id.* at 48:15–49:19. She had not brought enough cash to make a payment. *Id.* at 57:1–16. Because Plaintiff's first check was considered a bounced check, Plaintiff understood that she would be required to pay an additional $20. *Id.* at 50:12–13. According to Plaintiff, she was predisposed to paying

the $20 to end the situation, saying, "I didn't argue the $20. I had said, you know what, you can have it." *Id.*

Plaintiff showed or read Artistic's letter of explanation to approximately a dozen creditors and all but Home Depot accepted it without any problem. *Id.* at 16:12; 53:10–23. Although Plaintiff brought the Artistic letter to Home Depot to clear her name, no one would listen to her. *Id.* at 54:3–18. She explains, "Nobody would come down and talk to me. I mean, I had my license, all that stuff, to show that I'm, I was not a bad person. .... I wanted to clear me." [sic] *Id.* at 54:3–18.

On at least one occasion, Plaintiff spoke with Home Depot's Manager, "Tina," Christina Cunha, who later filed the criminal complaint. *Id.* at 63:11–67:19; 102:19–23. Plaintiff engaged in a conference call and "about a dozen" other discussions with an executive in Home Depot's Georgia headquarters, Mickey Davis, explaining her entire situation, beginning with Artistic's printing error. *Id.* at 66:20–67:9; 197:1–25. In total, she spent approximately $20 on phone calls to Georgia. *Id.* at 112:10–19. Home Depot acknowledges that Plaintiff made calls to its office in Georgia before she received a criminal summons. *Id.* at 68:6–14.

Immediately after Plaintiff's visit to Home Depot on or about August 22, finding no resolution, Plaintiff took matters into her own hands and wrote Home Depot a letter of explanation with a replacement check for the $35.20 original charge plus the $20 penalty the company demanded. *Id.* at 69:22–71:2, 87:11–90:25. The replacement check was cashed by Home Depot and cleared on September 14, 1999. *Id.* at 76:14–77:10.

In October 1999, Plaintiff received from Home Depot her criminal summons, an "arresting type of paper," accusing her of paying bad checks. *Id.* at 77:17–78:14.

Plaintiff states, "I took it as being, you know, like, I'm going to get arrested and go to jail. I've never gotten papers like that before in my life." *Id.* at 78:6–8. Plaintiff paid over $183 bond to avoid incarceration. *Id.* at 79:15–16, 19–20.

Traumatized, Plaintiff began calling friends to calm her down. *Id.* at 82:2. Then she again called Mickey Davis, the Home Depot executive in Georgia, and weeping, she pleaded with him to stop the prosecution. *Id.* at 87:11–90:25, 197:1–25. She communicated to him her frustrations: "Did somebody cash my check and pocket the money? [W]here is the deposit slip? That's what I kept asking Mickey Davis. Ask them for the deposit slip. Well, we can't find it. That's not my fault. That's not my problem. You know, do better record keeping." *Id.* at 131:5–24. She also cried on the phone with the District Justice's office, which told Plaintiff that its hands were tied. *Id.* at 95:18.

Between her October receipt of the summons and her January criminal hearing, Plaintiff was "upset constantly." *Id.* at 103:14–104:3. As she explains, "You think about it constantly, constantly what's going to happen. I never encountered something like this before....I mean, I was, I'm still, I still am extremely upset over this. But this should not have been happening....It's, it's in the back of my mind, it was in the back of my mind, what's going to happen, who's going to be there. You know, if you never had anything like this before, it kind of drives you a little crazy." *Id.* Plaintiff spent $758.48 to hire an attorney (*id.* at 113:8–15) and missed work on several occasions, though she lost no pay as a result of the case. *Id.* at 116:19–22; 117:14–118:5; 123:10–123:16; 148:4–8.

At Plaintiff's January 2000 hearing, Home Depot did not apologize. *Id.* at

192:10–193:4. On the contrary, the company sent unqualified representation, who merely "giggled and walked out." *Id.* at 194:17–195:5; 197:1–25. Though Plaintiff was acquitted, she still worries that she may experience negative repercussions from her case "being on file." *Id.* at 107:9–108:2; 108:16–19. She says, "I'm scared to death to fill out an application for fear they're going to find out about this.... I mean, I'm actually a really good girl." *Id.* at 109:18–112:1.

Plaintiff is a very private person. *Id.* at 133:14–134:12. However, since Plaintiff filed this suit on August 31, 2000, she has received unwanted media attention, including several articles in local newspapers, reprinted on the Internet, and radio stories, which have caused her a great deal of humiliation and embarrassment. *Id.* at 137:24–138:8; 141:23–143:8; 146:21–147:2; 162:1–25; 164:13–18; 165:21–166:9; 168:2–8. Plaintiff still cries on the phone to her best friends because of the stress of this case. *Id.* at 151:17–152:3.

On September 20, 2000, Home Depot removed this case to Federal Court based on diversity jurisdiction.

## III. DISCUSSION

### A. Statement of Jurisdiction

#### 1. The *Erie* Doctrine

■ When federal jurisdiction is based on diversity of citizenship under 28 U.S.C. § 1332, federal courts must, "[e]xcept in matters governed by the Federal Constitution or by Acts of Congress, ... [apply] the law of the State." *Erie Railroad v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Under the *Erie* Doctrine, federal diversity cases are governed by federal procedural laws, such as the Federal Rules of Civil Procedure. *See Hanna v. Plumer,* 380 U.S. 460, 473–74, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965) ("To hold that a Federal Rule of Civil Procedure must cease to function whenever it alters the mode of enforcing state-created rights would be to disembowel either the Constitution's grant of power over federal procedure or Congress' attempt to exercise that power in the Enabling Act."). *See also Henderson v. United States,* 517 U.S. 654, 668, 116 S.Ct. 1638, 134 L.Ed.2d 880 (1996) ("[A] Rule made by Congress supercedes conflicting laws no less than a Rule this Court prescribes."); *Budinich v. Becton Dickinson & Co.,* 486 U.S. 196, 199, 108 S.Ct. 1717, 100 L.Ed.2d 178 (1988); *Wayman v. Southard,* 23 U.S. (10 Wheat.) 1, 6 L.Ed. 253 (1825). Substantively, the forum state's laws govern—in this case Pennsylvania's, as established by the Pennsylvania Supreme Court. *See Commissioner of Internal Revenue v. Bosch's,* 387 U.S. 456, 465, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967). As the Third Circuit explained, applying *Erie,* "While the Federal Courts should properly employ its [sic] own rules of procedure to secure the just, efficient and prompt determination of all claims inherent in any litigation before it, nevertheless the ultimate results reached must be such as accord with the substantive jurisprudence of the State of the forum." (Citations omitted.) *Smith v. Whitmore,* 270 F.2d 741, 745 (3rd Cir. 1959).

■ Lower state court decisions are persuasive, but not binding, on the federal court's authority; if the State's highest court has not spoken on a particular issue, the "federal authorities must apply what they find to be the state law after giving 'proper regard' to relevant rulings of other courts of the State." *Id.; see also Polselli v. Nationwide Mut. Fire Ins.,* 126 F.3d 524, 528 (3d. Cir.1997); *Scranton Dunlop, Inc. v. St. Paul Fire & Marine Ins. Co.,* 2000 WL 1100779, at *1 (E.D.Pa.Aug.4, 2000) ("Since this is a matter of state law

that has not been decided by the Pennsylvania Supreme Court, a prediction must be made as to how that court would rule if confronted with the same facts.").

## 2. Complete Diversity

■ Federal diversity jurisdiction exists where the parties have complete diversity and the amount in controversy exceeds $75,000. 28 U.S.C. § 1332. Plaintiff is a Pennsylvania citizen, while Home Depot is a Delaware Corporation with its principle place of business in Georgia and Artistic is organized and has its principle place of business in Arkansas. Complete diversity is therefore established.

## 3. Amount in Controversy

The amount in controversy is not so readily determinable. Plaintiff's Complaint[1] demands judgment against Home Depot "in excess of $50,000.00, plus punitive damages, costs, interest and said other relief as the court may deem proper," and demands judgment against Artistic "in excess of $50,000.00 and such other relief as the court may deem proper under the

circumstances." Complaint at 9, 11. Defendant Home Depot's Removal merely states without explanation that "the amount in controversy in this action is in excess of the amount of $75,0000.00 [sic], exclusive of interest and costs." Removal at Line 7. Plaintiff did not respond to Home Depot's Removal and has not raised subject matter jurisdiction in its responses to summary judgment.

■ In light of Plaintiff's complaints against two unrelated defendants for an unspecific amount over $50,000—and the fact that Plaintiff's pecuniary losses seem to be less than a thousand dollars—it is not obvious to us that Plaintiff's suit concerns a jurisdictionally-sound value over $75,000. It is obvious, however, that neither party gave the issue the consideration it requires. Nonetheless, federal procedural guidelines dictate that we may consider jurisdiction on our own at any time.[2] *In re Orthopedic "Bone Screw" Products Liability Litigation*, 132 F.3d 152, 155 (3rd Cir.1997) (*"Bone Screw"*) citing *Underwood v. Maloney*, 256 F.2d 334 (3d Cir.), cert. denied, 358 U.S. 864, 79 S.Ct.

---

1. Plaintiff originally filed her Complaint in the Court of Common Pleas of Northampton County, Pennsylvania, Civil Division, Docket Number C0048–CV–2000 on August 31, 2000 ("Complaint"). A copy is appended as Exhibit A to Defendant Home Depot's Removal.

2. Our prerogative is so extensive in this area that the Third Circuit has held we may even consider jurisdiction after a jury trial. The Court held, "[W]hen it appears to a legal certainty that the plaintiff was never entitled to recover the minimum amount set by Section 1332, the removed case must be remanded even if the jurisdictional deficiency becomes evident only after trial." *Meritcare Inc. v. St. Paul Mercury Insurance Co.*, 166 F.3d 214, 217 (3d Cir.1999), citing *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 289, 58 S.Ct. 586, 82 L.Ed. 845 (1938). Under *St. Paul Mercury Indem. Co.*, the fact that Plaintiff in the end does not recover over $75,000 is not dispositive. *Id.* "[T]he

amount in controversy is measured as of the date of removal." *Id.* To justify a remand based on an insufficient amount in controversy, it must be apparent, "to a legal certainty, that the plaintiff cannot recover the amount claimed, or ..., from the proofs, the court [must be] satisfied to a like certainty that the plaintiff never was entitled to recover that amount.... [In such a situation, t]he suit will be dismissed." [Citations omitted.] *Id.* The *St. Paul Mercury Indem. Co.* court concluded, "Events occurring subsequent to the institution of suit which reduce the amount recoverable below the statutory limit do not oust jurisdiction." *Id.* Here, because we are giving thorough consideration to jurisdiction now, exercising our discretion to consider the amount in controversy at the time of removal, we do not anticipate any cause for the parties to raise the issue later as a 12(b)(1) motion or otherwise.

93, 3 L.Ed.2d 97 (1958). The parties may not confer jurisdiction by consent, i.e. by agreeing to remain before our Court despite jurisdictional deficiency. *Meritcare,* 166 F.3d at 217. The law is straightforward in this respect: if we determine that a case before us lacks subject matter jurisdiction, we have no authority under the Constitution to decide a case on the merits. *Bone Screw,* 132 F.3d at 155. Where a case has been removed from state court, like this case, it must be remanded without prejudice if jurisdiction is lacking. *See Bradgate Associates v. Fellows, Read & Associates,* 999 F.2d 745, 750–51 (3d Cir. 1993) (finding that, where the district court lacks subject matter jurisdiction, it must remand a removed state court case).

■ The sum Plaintiff claims controls the determination of the amount in controversy if her claim was made in good faith—the latter is not at issue here. *St. Paul Mercury Indem. Co.,* 303 U.S. at 288, 58 S.Ct. 586; *Dardovitch v. Haltzman,* 190 F.3d 125, 135 (3rd Cir.1999). *See also Angus v. Shiley, Inc.,* 989 F.2d 142, 145 (3d Cir.1993) ("The general federal rule is to decide the amount in controversy from

the complaint itself."). However, Plaintiff Hayfield does not specifically demand over $75,000 of either Defendant. Thus, to enable jurisdiction, we would be required to find that the claims against Defendants, which specifically demand more than $50,000 each, actually demand over $75,000 each.[3] Otherwise, we must aggregate her claims in order to reach the jurisdictional minimum.

### 4. Aggregation

Another court in our District recently confronted a similar situation. *See C.D. Peacock, Inc. v. Neiman Marcus Group, Inc.,* 1998 WL 111738 (E.D.Pa.,1998). In *Peacock,* the plaintiff jewelry vendor alleged that he did not receive his merchandise from a supplier, Yurman, in breach of their contract, because the Neiman Marcus department store interfered with the contract and business relations between the two, monopolizing the supplier's attention. *Peacock,* 1998 WL 111738 at *1. The supplier could be liable only for the value of the undelivered merchandise, well under the jurisdictional minimum, but the interfering department store was potentially liable for two counts sounding in tort,

---

**3.** Plaintiff's claims were originally filed in the Court of Common Pleas of Northampton County, which jurisdictionally requires pleading an amount in controversy over $50,000.00 to avoid compulsory arbitration. *See* Complaint. *See also* regarding filing requirements Pa. R. Civ. P. 1021(c). Plaintiff's complaint is obviously worded to comply with the county's jurisdictional requirement. The Third Circuit has held that such *ad damnum* clauses are "little more than ... open-ended claims that fail[ ] to answer the amount in controversy inquiry." *Meritcare,* 166 F.3d at 217. Here, the Complaint gives no cause to believe that Plaintiff specifically calculated the damages to which she would be entitled and arrived at an amount approximating $50,000. In other words, Plaintiff's complaint gives no indication how much over $50,000 damages she claims, and does not suggest that she intended to limit herself to recovery exceeding $50,000 but less than $75,000. As we will

see, non-pecuniary compensatory and punitive damages make up the bulk of Plaintiff's potential recovery. Projecting the value of these damages before trial is imprecise. Hence, without straying from the underlying nature of Plaintiff's complaint, we may in our exercise of discretion find that this controversy is more likely than not to concern $75,000 in damages—our federal jurisdictional minimum—as easily as $50,000—the state jurisdictional minimum. *See Angus,* 989 F.2d at 146 ("Given that the complaint does not limit its request for damages to a precise monetary amount, the district court properly made an independent appraisal of the value of the claim. ...") *See also Mangano v. Halina,* 1997 WL 697952 (E.D.Pa.1997) (exercising discretion and reaching the opposite conclusion in a personal injury case without potential punitive damages, where the claimed amount in controversy "exceed[ed] $50,000" and $75,000 was required).

which when combined were worth over $100,000. *Id.* The court explained in a footnote,

> A single plaintiff's claims against more than one defendant are aggregated to determine the jurisdictional amount in controversy only if the claims are so "integrated" and "tied together by combination or conspiracy, as to make the relief single;" otherwise, "where a plaintiff alleges independent, several liability against more than one defendant, plaintiff's claims against each defendant must individually satisfy the amount in controversy requirement."

*Peacock,* 1998 WL 111738 at *2 FN2, citing *Cottman Transmission v. Metro Distrib.,* 796 F.Supp. 838, 841 (E.D.Pa.1992) (internal quotations omitted), vacated on other grounds, 36 F.3d 291 (3d Cir.1994). However, after reiterating the *Cottman* rule, the *Peacock* court opted not to decide the issue of whether the action against the supplier was properly before the court, as follows:

> Peacock's breach of contract claim against Yurman [the supplier] for $11,000.00 obviously does not, alone, satisfy the jurisdictional amount. Even assuming Peacock's claim against Yurman is so "integrated" with Peacock's claims against Neiman Marcus, it is still necessary that the two tort claims against Neiman Marcus be aggregated to attain the jurisdictional amount. Therefore, the primary issue to be resolved in my analysis is whether the two tort claims in Counts II and III can be properly aggregated. *Id.*

After holding that the claims against Neiman Marcus could be aggregated, the court stated in a footnote without further explanation, "The Court exercises its supplemental jurisdiction over the breach of contract claim against Yurman for $11,000 in Count I." *Id.* at *5 FN5. We are not content to assert such jurisdiction without analysis, like the court in the 1998 *Peacock* case, given the Third Circuit's 1999 admonishment to strictly construe the removal statute in light of "the congressional intent to restrict federal diversity litigation." *Meritcare,* 166 F.3d at 217.[4]

█ We find no Third Circuit rule respecting the aggregation of claims against multiple defendants to attain the amount in controversy requirement. We believe, however, that if multiple defendants jointly harm a common plaintiff, then the claims against these defendants are integrated and may be aggregated for the purpose of calculating the amount in controversy required for federal jurisdiction. For similar approaches, *see Jewell v. Grain Dealers Mut. Ins. Co.,* 290 F.2d 11, 13 (5th Cir. 1961) ("Claims against two or more defendants can be aggregated for the purpose of attaining the jurisdictional amount ... [only] if [the defendants] are jointly liable to the plaintiff.") citing *Walter v. Northeastern R. Co.,* 147 U.S. 370, 373 13 S.Ct. 348, 37 L.Ed. 206 (1893); *Trustees of Boston University v. ASM Communications, Inc.,* 33 F.Supp.2d 66, 76 (D.Mass.1998) (citing *Jewell* ); *Libby v. City Nat'l Bank,* 592 F.2d 504, 510 (9th Cir.1978) (The "tests for aggregating claims of one plain-

---

4. The *Cottman* court, whose rule *Peacock* cites, also forewent the opportunity to apply its own rule of aggregation, stating, "[We] need not determine whether or not Cottman's claims are integrated or several since Cottman has submitted the affidavit of Edward Kelly in response to defendants' motion. Mr. Kelly's affidavit states, inter alia, that Cottman's claims against each defendant are well in excess of [the jurisdictional minimum]." *Cottman,* 796 F.Supp. at 841. That is, the *Cottman* scenario was distinguishable from ours and Peacock's, in that there existed no combination of a claim against a defendant under the jurisdictional minimum with a claim against a defendant for more than the required amount.

tiff against multiple defendants and multiple plaintiffs against one defendant are essentially the same ...: the plaintiff's claims against the defendants must be common and undivided so that the defendant's liability is joint and not several."); 14B C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3704, pp. 145–156 (3d ed. 1998 & 2001 Pocket Part) ("It is only when two or more plaintiffs have a common, undivided interest in the subject matter of the litigation and a single title or right is involved in the litigation that the claims of the coparties have been added together in determining whether the statutory amount in controversy requirement has been satisfied. The same exception to the basic rule against aggregation applies when the suit is against multiple defendants.").

 Though the Third Circuit has not ruled on aggregation of multiple defendants, the Court's position is clear regarding aggregation of multiple plaintiffs' separate and distinct claims: the Third Circuit opposes such aggregation, even of claims arising out of the same factual circumstances, unless each plaintiff individually reaches the $75,000 minimum. *Meritcare,* 166 F.3d at 218. In the 1999 *Meritcare* decision, the Third Circuit ruled on an apparent conflict being considered by many circuit courts—namely, how to reconcile 28 U.S.C. § 1367, enacted in 1990, creating supplemental jurisdiction,[5] with the U.S. Supreme Court's decision in *Zahn v. International Paper Co.,* 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973). Relying on the legislative history of Section 1367, the *Meritcare* court decided to preserve the essence of *Zahn,* rejecting other circuits' holdings that Section 1367 statutorily eviscerated *Zahn. Meritcare,* 166 F.3d at 221.[6]

Discussions regarding the optimal scope of diversity jurisdiction attempt to balance

---

**5.** We refer to the Judicial Improvements Act of 1990, Pub.L. 101–650, Title III, § 310(a), 104 Stat. 5113 (codified as 28 U.S.C. § 1367) ("Section 1367"). The Third Circuit's *Meritcare* holding explains Section 1367 as follows: "Subsection (a) of Section 1367 provides that when District Courts have original jurisdiction they 'shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy.... Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.' Subsection (b), however, narrows supplemental jurisdiction in cases brought solely under the diversity statute, 28 U.S.C. § 1332. In that context, supplemental jurisdiction does not extend to 'claims by plaintiffs against persons made parties' under Fed.R.Civ.P. 14 (third-party practice), Rule 19 (mandatory joinder), Rule 20 (permissive joinder), Rule 24 (intervention), or 'over claims by persons proposed to be joined as plaintiffs under Rule 19 ..., or seeking to intervene as plaintiffs under Rule 24 ... when exercising supplemental jurisdiction over such claims would be inconsistent with the jurisdictional require-

ments of section 1332.' " *Meritcare,* 166 F.3d at 218–219.

**6.** The most prominent holdings rejected by the Third Circuit in *Meritcare* included the Fifth Circuit's decision in *In re Abbott Laboratories,* 51 F.3d 524, 528–529 (5th Cir.1995), *aff'd by equally divided court sub nom., Free v. Abbott Labs., Inc.,* 529 U.S. 333, 120 S.Ct. 1578, 146 L.Ed.2d 306 (2000), and the Seventh Circuit's similar holding in *Stromberg Metal Works, Inc. v. Press Mechanical, Inc.,* 77 F.3d 928 (7th Cir.1996). The Third Circuit reaffirmed its *Meritcare* holdings after the Supreme Court's ruling on *Abbott Labs. See In re LifeUSA Holding Inc.,* 242 F.3d 136, 142 (2001). The Supreme Court has yet to rule on the apparent circuit split. *See* 14B Wright, Miller & Cooper at 2001 Pocket Part § 3704 ("The Supreme Court granted certiorari to the Abbott case, but divided evenly, with Justice O'Connor not participating in the decision. The divided Court means that the decision of the Fifth Circuit is affirmed in the Abbott Labs case, but it remains to be seen whether Zahn will survive. The issue undoubtedly will return to the Supreme Court.")

fairness to all parties with judicial economy and the narrow mandate of the federal courts. In 1968, in *Jacobson v. Atlantic City Hospital*, the Third Circuit iterated the "single action" theory, interpreting a then-recent Supreme Court decision:

> [M]ost of the operative facts are common to the coupled claims, and in normal and most convenient and expeditious practice and procedure these claims would be tried together in a single lawsuit. In such circumstances, it seems reasonable and proper to view the lawsuit as a single "action" within diversity jurisdiction without requiring that each claim exhibits all of the jurisdictional requirements.

*Jacobson v. Atlantic City Hospital*, 392 F.2d 149, 154 (3rd Cir.1968), citing *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725 n. 13, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966).

The *Zahn* decision effectively held (without directly saying so) that *Jacobson* and similar cases, in the name of fairness, overemphasized efficiency and convenience, unjustifiably expanding the federal courts' limited jurisdiction. In *Zahn*, the plaintiffs were a class of landowners suing a polluter that damaged their properties by its actions. *Zahn*, 414 U.S. at 292, 94 S.Ct. 505. The Court held that those plaintiffs whose claims were worth less than the jurisdictional minimum could not be heard in federal court. *Id.* at 292, 94 S.Ct. 505. The court summed up its reasoning: "[O]ne plaintiff may not ride in on another's coattails." (Citations omitted.) *Id.* at 301, 94 S.Ct. 505. In *Zahn*, each landowner class member would have been required to make a separate showing of damages evidence.[7] The Court refused to call into question "the accepted approach to cases involving ordinary joinder of plaintiffs with separate and distinct claims." *Id.* at 302, 94 S.Ct. 505.

Nothing in the *Zahn* decision, or in *Meritcare* following *Zahn*, suggests that the courts' rulings would exclude from federal jurisdiction plaintiffs with a common and undivided interest (as opposed to separate and distinct ones) valued greater than the jurisdictional minimum. Neither would the ruling prevent aggregation in the case at bar involving jointly acting Defendants liable for more than $75,000. On the contrary, *Zahn* cited with approval the Supreme Court's opinion in *Walter v. Northeastern R. Co.*, which held that as early as 1893 it was "well settled" that "when two or more defendants are sued by the same plaintiff in one suit the test of jurisdiction is the joint or several character of the liability to the plaintiff." *Zahn*, 414 U.S. at 295, 94 S.Ct. 505 FN3, citing *Walter*, 147 U.S. at 373, 13 S.Ct. 348.[8] In other words, if Artistic and Home Depot are considered joint actors, then Plaintiff's claims against them may be properly aggregated.[9]

---

7. As in *Zahn*, the *Meritcare* plaintiffs could not be aggregated because one plaintiff "allege[d] damages that differ[ed] from those of [the other plaintiff] and [were] not of an undivided interest." *Meritcare*, 166 F.3d at 218. On the contrary, as we will see, Home Depot and Artistic in this case can be considered joint actors, and thus the claims against them should be aggregated.

8. The *Meritcare* decision interprets Section 1367 as upholding *Zahn*, "and thus maintains the traditional rules governing diversity of citizenship and the amount in controversy under 28 U.S.C. § 1332." *Meritcare*, 166 F.3d at 222, followed in *LifeUSA*, 242 F.3d at 142 FN7. The traditional rules are defined in *Walter*—the *Walter* decision remains good law.

9. It warrants mention that in the Third Circuit, under *Meritcare*, Plaintiff's claims could not be properly aggregated were Defendants not joint actors—though it would be tempting to do so for the sake of convenience. *See, e.g., Travelers Indemnity Company of Illinois*

We note that our holding disagrees with that of a pre-*Meritcare* case from the District Court of New Jersey, in our circuit. In *Garcia v. Gallo*, the court held that one of the defendants, a nonprofit charitable hospital, could not be included in a federal suit with co-defendant doctors and hospital staff because the hospital benefitted from statutory charitable immunity preventing liability over $10,000. *Garcia v. Gallo*, 665 F.Supp. 360, 363 (D.N.J.1987). Therefore, the court decided, the hospital could not be held to answer for the minimum required amount in controversy to maintain a federal action. *Id.* The *Garcia* court held that it was "inconceivable" after *Zahn* that the Supreme Court "would countenance jurisdiction over a claim against a pendant defendant below the statutory minimum even if the parties were completely diverse." *Id.* We believe that *Garcia*'s holding interprets *Zahn* and its progeny too broadly.

The Supreme Court's holding in *Zahn*, and *Meritcare*'s reaffirming of *Zahn*, do establish clearly, among other things, that the Third Circuit will not permit plaintiffs with separate and distinct claims under the jurisdictional minimum to aggregate their claims merely because they arise from a common set of facts. However, these courts do not address the situation faced here, with multiple defendants who are jointly and severally liable.

The non-profit hospital in *Garcia* may also have been a joint tortfeasor, like Defendants in the case at bar. *Garcia*, 665 F.Supp. at 361. However, the *Garcia* court, in its discretion, could still have refused to hear the case against the hospital—without such a sweeping statement of law—by giving force to the New Jersey charitable immunity legislation barring hospital liability greater than $10,000.

*v. Clark*, 1994 WL 384722, *2–*3 (E.D.Pa.) ("Although arising from a single accident, the claims are distinct. Any liability would be several rather than joint. Therefore, [Plaintiff] may not aggregate the defendants' claims to meet the jurisdictional amount.").

If Artistic and Home Depot were separate and distinct actors, in this hypothetical instance, and if Plaintiff's case against Home Depot was worth over $75,000 and her case against Artistic was worth less than $75,000, we could not allow Artistic's inclusion in the federal suit. In such a case, Artistic's exclusion would occur despite complete diversity and a common set of facts.

The highly-regarded Federal Practice and Procedure treatise, Wright, Miller and Cooper, explains the problem posed: "This is a more appealing case for aggregation than the situation ... in which no one of the individual claims satisfied the statute. In that other context, a refusal to permit aggregation means that all the claims must be brought in a state court in which, presumably, they could be joined or otherwise conveniently tried. But in the situation now under consideration, the party with the claim for more than the $75,000 has a statutory right to assert his or her claim in a federal court and, if joinder is

not permitted, the party with the smaller claim must bring a duplicative, and therefore inefficient independent suit in a state court that may lead to an inconsistency in result. Historically, some commentators argued that in these circumstances the two parties should be permitted to join in one action, with the larger claim satisfying the statutory jurisdictional amount requirement for the entire suit and the smaller claim coming within what traditionally was referred to as the court's pendent party, and what now is called supplemental, subject matter jurisdiction. .... Despite the legitimate arguments for allowing joinder of claims held by multiple plaintiffs that were lacking in the requisite jurisdictional amount, the historical rule supported by an impressive array of judicial precedents clearly prohibited the joinder of jurisdictionally insufficient claims." 14B Wright, Miller and Cooper at 153, 155–156. "The same rule also applies when suit is brought by a single plaintiff against multiple defendants." *Id.* at 141.

The Third Circuit in *Meritcare* and *LifeUSA* followed this "historical" rule more narrowly restricting the court's ambit in situations concerning separate and distinct claims. *Meritcare*, 166 F.3d at 222, followed in *LifeUSA*, 242 F.3d at 142 FN7.

*See,* e.g., *Pacilli v. Garden State Hosp.,* 1992 WL 17467, *1 (E.D.Pa.1992) (dismissing for lack of subject matter jurisdiction based on an insufficient amount in controversy a complaint against hospital benefitting from charitable immunity in New Jersey). In other words, the *Garcia* hospital defendant was already statutorily immune to any consideration as a joint actor which could subject it to impermissibly excessive liability. We believe the *Garcia* court omitted a critical issue by announcing a broad holding concerning aggregation of defendants without mentioning the traditional joint actors exception to the general rule.

## 5. Joint and Several Liability

It remains for us to decide if Defendants are joint actors. If Defendants are treated as joint actors, they will be "jointly and severally liable" to the Plaintiff for her injuries. *Baker v. ACandS,* 562 Pa. 290, 755 A.2d 664, 669 (2000) (citing *Incollingo v. Ewing,* 474 Pa. 527, 379 A.2d 79, 85 (1977)). In a diversity case like ours, joint and several liability, like the right of contribution, is determined as a substantive matter rather than a procedural one; State law is therefore applied under *Erie. See Smith v. Whitmore,* 270 F.2d at 743–745 (applying the Pennsylvania Uniform Contribution Among Joint Tortfeasors Act in a diversity case because it gives a substantive state law right of contribution). *See also,* following *Smith v. Whitmore, Fehlhaber v. Indian Trails,* 45 F.R.D. 285, 286 (D.Del. 1968) ("It is well established in this Circuit that the right to contribution among joint tortfeasors in diversity cases is controlled by State law.").

Under Pennsylvania law, parties are deemed joint actors when their actions build upon one another to produce an indivisible injury. *In re Blatstein,* 260 B.R. 698, 720 (E.D.Pa.2001), citing *Baker v. AC & S, Inc.,* 729 A.2d 1140, 1146 (Pa.Super.Ct.1999) ("Under Pennsylvania law, it is well-established that if the tortious conduct of two or more persons combines to cause a single harm which cannot be apportioned, the actors are joint tortfeasors even though they may have acted independently."), aff'd, 562 Pa. 290, 755 A.2d 664 (2000); *Capone v. Donovan,* 332 Pa.Super. 185, 480 A.2d 1249, 1251 (1984), citing Rest.2d Torts § 879 ("If the tortious conduct of two or more persons causes a single harm which cannot be apportioned, the actors are joint tortfeasors even though they may have acted independently."). In other words, in determining whether Defendants acted as joint actors, we need not look for collaboration or concurrence among Defendants' actions, but for an inseverable consequence of their actions.[10] Whether harm is capable of apportionment is a question of law for the court. *Capone,* 332 Pa.Super. at 189, 480 A.2d 1249.

The Restatement (Second) of Torts, section 879, cited in *Capone,* provides a helpful example:

A negligently knocks B into the street, the impact causing B no substantial harm. Before B can arise, however, he is negligently run over by C.... B is severely hurt. For this harm B is entitled to a judgment for the entire amount of harm against A, C ... or [both] of them. Restatement (Second) of Torts § 879 (1977 Main Vol.), Illustration 2.

**10.** Integration exists and aggregation is appropriate where the harm is a product of combination *or* conspiracy between the defendants. *Peacock,* 1998 WL 111738 at *2 FN2;

*Cottman,* 796 F.Supp. at 841. Here we find combination without conspiracy, which is nonetheless sufficient to find Defendants jointly and severally liable.

We compare Artistic's misprinting of Plaintiff's check with A's action negligently knocking B into the street in the Restatement example, and Home Depot's action in prosecuting Plaintiff with C's action running over B. According to Plaintiff's version of the events, but for Artistic's misprinted check, Plaintiff would have had no problem with Home Depot. But for Home Depot's actions in charging Plaintiff, she would not have been prosecuted and no real harm would have been done—Artistic had already refunded the small value of the checks purchased and written a letter of explanation which was accepted by Plaintiff's other creditors. Plaintiff's Depo. at 25:22–27:4; 31:18–22. Only Home Depot's action required Plaintiff to spend money defending herself and produced the distress that is the subject of this claim. Returning to the analogy, Plaintiff would have been able to return safely to the curb had Home Depot not run her over with its prosecution. The harms can thus be said to be indivisible, based on the Restatement's guidance, even though Artistic was not alleged to have breached any duty to Plaintiff following its initial printing error. Plaintiff's claims against Artistic and Home Depot are integrated and may be aggregated for the purposes of calculating compliance with the jurisdictional minimum.

Our decision is unaffected by the fact that Plaintiff alleges negligence against Artistic and an intentional tort against Home Depot. *See Glomb by Salopek v. Glomb,* 366 Pa.Super. 206, 530 A.2d 1362 (Pa.Super.1987), *appeal denied by Glomb by Salopek v. Glomb,* 517 Pa. 623, 538 A.2d 876 (1988) (allowing negligent tortfeasors to be held jointly and severally liable with an intentional tortfeasor where parents' negligence allowed a baby-sitter to assault their child). The *Glomb* court held that the fundamental inquiry is "whether a 'logical, reasonable or prac-

tical' basis for apportionment exists:" the respective theories of liability against the various defendants are not relevant to whether or not the parties can be considered joint actors. *Id.* at 212, 530 A.2d 1362 FN3.

We are similarly unmoved by the fact that Plaintiff alleges alternative bases for relief—breach of contract, negligence and malicious prosecution. A federal district court in Minnesota confronted a very similar situation, holding, "A single wrong is not parlayed into separate and independent causes of action by multiplying the legal theories upon which relief is sought or by multiplying defendants against whom a remedy is sought for the same injury." *Frontier Enterprises, Inc. v. ICA Corporation,* 319 F.Supp. 1156, 1159–60 (D.Minn.1970). In *Frontier Enterprises,* despite the complaint's "rather general wording," it alleged three bases of recovery in contract and tort "as alternative grounds for relief from a single wrong arising from the interrelated conduct and activities of all of the defendants." *Id.* at 1160. We find the same to be true of Plaintiff Hayfield's complaint, which mimics much of the same language throughout each count, though the counts contain different bases. *See* Complaint. As in the case at bar, the various bases in *Frontier Enterprises* all concerned a single actionable wrong—in that case, it was an advance sum of money paid by the plaintiff and wrongly withheld through the defendants' actions. *Frontier Enterprises,* 319 F.Supp. at 1160. In our case, the single actionable wrong concerns Defendant Home Depot's unsuccessful criminal suit premised on the bad check printed by Defendant Artistic. As the *Frontier Enterprises* court found, "The facts in each portion of the complaint relate to this one incident." *Id.* As was the case in *Frontier Enterprises (id.),* Plaintiff Hayfield's

three bases are not separate and independent under the removal statute. *See generally American Fire & Casualty Co. v. Finn*, 341 U.S. 6, 71 S.Ct. 534, 95 L.Ed. 702 (1951) (setting forth doctrine regarding separate and independent causes of action under the federal removal statute).

■ Aggregating Plaintiffs three counts, we remain within Pennsylvania's "one satisfaction" rule that although "a plaintiff may obtain a judgment against several tortfeasors for the same harm, [under Pennsylvania law] he or she is entitled to only one satisfaction for that harm." *Greenleaf v. Garlock, Inc.*, 174 F.3d 352, 357 (3rd Cir.1999). *See also Suber v. Chrysler Corp.*, 104 F.3d 578, 588 (3d Cir.1997) ("If these claims are alternative bases of recovery for the same harm under state law, Suber could not be awarded damages for both, and a court should not aggregate the claims to arrive at the amount in controversy."). Under the one satisfaction rule, Plaintiff could not recover, for example, $750 from Home Depot for having had to hire an attorney to defend the criminal prosecution, and then recover the same $750 from Artistic. The *Suber* holding dictates the common sense proposition that the $750 fee does not become $1500 toward the amount in controversy merely because Plaintiff could potentially recover the fee from either defendant. Our aggregation of Defendants is not to this end, but rather, because Defendants are joint actors who created an indivisible harm. We reach the minimum amount in controversy not by multiplying Plaintiff's actual and compensatory losses by the number of counts—a total which would still be well under $75,000—but because of Home Depot's substantial liability for punitive damages, as we discuss below.

■ Finally, we hold that Plaintiff's allegation of punitive damages only against Home Depot does not change our determination that Defendants are joint actors for purposes of calculating the amount in controversy. In Pennsylvania, the right to punitive damages "is a mere incident to a cause of action—an element which the jury may consider in making its determination—and not the subject of an action in itself." *Hilbert v. Roth*, 395 Pa. 270, 276–277, 149 A.2d 648 (1959). As an "incident to a cause of action," punitive damages constitute no "separate and distinct" cause of action against Home Depot which would prevent hearing Plaintiff's case against Artistic along with her case against Home Depot. For similar reasoning, *see Frontier Enterprises*, 319 F.Supp. at 1160 ("[I]t is immaterial that Frontier requests exemplary and punitive damages in addition to compensatory damages, since a prayer for such damages does not constitute a separate and independent cause of action for removal purposes.").

Punitive damages are apportionable. *See generally Pennsylvania Suggested Standard Civil Jury Instructions*, Pennsylvania Bar Institute, "14.02 (Civ) 'Punitive Damages.'" In so holding, we do not follow the teetering nineteenth-century Pennsylvania rule, known as the *McCarthy* rule or the "most innocent defendant" rule, that punitive damages could only be assessed if the "most innocent of the defendants" were liable for them. Under the *McCarthy* rule,

> [A]s respects exemplary [or punitive] damages beyond compensation for the injury done to the plaintiff, [the jury should be instructed] to assess them according to the acts of the most innocent of the defendants, and if any defendant was not liable for exemplary damages, none should be included in the verdict.

*McCarthy v. DeArmit*, 99 Pa. 63 (1881). Though this standard has been dead for all practical purposes for some time, it has remained standing, an old snag waiting for

the wind of decision to completely knock it down.[11]

■ We follow the path of the Civil Jury Instructions Subcommittee of the Pennsylvania Supreme Court discussing the dubiousness of the "most innocent defendant" rule. *Pennsylvania Suggested Standard Civil Jury Instructions,*14.02 (Civ) at 3. The Subcommittee explained that Pennsylvania law encourages joinder of tortfeasors in the same action, Pa.R.C.P. 2229(b), and that the *McCarthy* rule would "frustrate the policy underlying punitive damages" to punish a defendant that acts outrageously and deter future similar conduct, "for every defendant could 'hide' behind the actions of the least culpable or most innocent of them all." *Id.* at 4. As the committee said,

> The anomaly of requiring a plaintiff to maintain a multiplicity of actions in order to have punitive damages properly assessed against each of many joint tortfeasors, while at the same time encouraging parties to consolidate common actions in an effort to minimize cost of litigation and expenditure of judicial resources can be corrected by recognizing the fallacy of *McCarthy*'s century-old reasoning. (Internal citations omitted.) *Id.* at 4–5.

The Subcommittee cites in support the rules allowing joinder of defendants not interested in defending against all relief demanded (Rule 2231(f)) and allowing special findings to determine issues among the parties. (Rule 2257). *Id.* at 5. The danger originally redressed by *McCarthy*, that an innocent defendant would be stuck paying the bill for a more culpable one, is prevented by "the requirement that punitive damages be assessed by the jury separately against each defendant." *Id.* Deterrence can only be served by making defendants pay commensurate with the outrageousness of their conduct. *Id.*

For similar approaches in other jurisdictions, *see Willoughby v. Sinclair Oil & Gas Co.,* 89 F.Supp. 994, 996 (D.C.Okl. 1950) ("In many jurisdictions an injured party can obtain joint compensatory damages and separate punitive damages against joint tort-feasors in a single lawsuit." (List of citations omitted.)); *Ford Motor Credit Company v. Hill,* 245 F.Supp. 796, 797 (W.D.Mo.1965) (allowing apportionment of punitive damages between joint tortfeasors where compensatory damages were not apportionable).

### 6. Valuation of the Claims

■ Now that we have established that Plaintiff's causes of action against the Defendants should be aggregated, we examine whether the indivisible harms against her are more likely than not to concern over $75,000.[12] As we do so, we

---

**11.** Modern-era decisions responding to arguments by defendants trying to wiggle their ways out of paying punitive damages have already distinguished *McCarthy* to death. *See,* e.g., *Paulson v. Celotex,* 1986 WL 12027, *3 (E.D.Pa.) ("This [most innocent defendant] doctrine, whatever its contemporary validity, has no application in asbestos cases, where jury instructions assure that each defendant's liability for punitive damages depends only on that defendant's conduct and where defendants are tried together to further judicial economy."), citing *Neal v. Carey Canadian Mines, Ltd.,* 548 F.Supp. 357, 389 (E.D.Pa. 1982), *aff'd sub nom. Van Buskirk v. Carey Canadian Mines, Ltd.,* 760 F.2d 481(3d Cir. 1985). The law in the *Paulson* asbestos case is readily applicable to our situation and all others where a jury will be instructed to apportion punitive damages based on culpability and where defendants will be tried together for efficiency and based upon the indivisibility of the harms to plaintiff.

**12.** Though the Third Circuit has not ruled specifically on the appropriate evidentiary standard, many courts in our Circuit and nationally have held that a preponderance of the evidence is sufficient to establish the amount in controversy for the purpose of establishing

do not consider the legal sufficiency of her claims or whether her legal theories are sound. *Suber,* 104 F.3d at 583. Plaintiff claims she is due the $20.00 returned check fee, "like $20" in phone bills arguing with officials at Home Depot's Georgia headquarters and $758.48 attorney fees in defending the criminal complaint brought by Home Depot. Complaint at 4–9; Plaintiff's Depo. at 112:10–19,113:8–15. She further claims compensatory damages for loss of liberty or time, harm to reputation, physical discomfort, interruption of her employment, mental anguish, humiliation and injury to her feelings, and punitive damages for a total in excess of $50,000.00.[13] *Id.* Plaintiff's enumerated pecuniary losses amount to $798.48. Thus, Plaintiff's non-pecuniary losses would more likely than not need to amount to a claim of at least $74,201.53 to enable her claims to attain the jurisdictional minimum in this court ($75,000.01). For similar reasoning, *see Flail v. The Travelers Companies,* 1998 WL 709296, *2 (E.D.Pa.1998).

 Compensatory damages are designed "to put the injured person in a position as nearly as possible equivalent to his or her position prior to the tort." *Moorhead v. Crozer Chester Medical Center,* 564 Pa. 156, 765 A.2d 786, 790 (2001), citing *Trosky v. Civil Service Comm'n,*

*City of Pittsburgh,* 539 Pa. 356, 652 A.2d 813, 817 (1995). Such damages cannot be presumed (*Moorhead, id.* citing *Maxwell v. Schaefer,* 381 Pa. 13, 112 A.2d 69, 73 (1955)) and must be proven by competent evidence. *Maxwell, id.* In a malicious prosecution action, compensatory damages may include, *inter alia,* harm to reputation, mental anguish, humiliation and injury to feelings. *Wecht v. PG Pub. Co.,* 725 A.2d 788, 789 (Pa.Super.1999), *appeal denied by Wecht v. P.G. Pub. Co.,* 560 Pa. 710, 743 A.2d 922 (1999). Plaintiff indicates that she lost time at the criminal hearing as a result of Home Depot's allegedly malicious prosecution, and that her job was interrupted for the appointments with her attorney, for hearings and her deposition. Plaintiff's Response to Home Depot at 5; Plaintiff's Depo. at 147, 156. However, Plaintiff acknowledges that she did not lose any money based on the time she missed from work. Plaintiff's Depo. at 117:19–118:2. She indicates that she thought she was going to be arrested and still fears that she will not get another job because of her "criminal record"—though she admits that Magistrate Judge Rapoport told her that there would be no prejudicial record of Home Depot's instigated prosecution on record against her. Plaintiff's Response at 6; Plaintiff's Depo. at

---

federal diversity jurisdiction. In other words, the removing defendant, Home Depot, must establish that it is more likely than not that the Plaintiff's claims against it involve more than $75,000. We will not repeat the exhaustive discussion of the evidentiary question already conducted by several fellow district courts in the Third Circuit. *See,* e.g., *Penn v. Wal–Mart Stores, Inc.,* 116 F.Supp.2d 557 (D.N.J.2000) (holding that a defendant who removes action to federal court on diversity grounds must show by a preponderance of the evidence that amount in controversy exceeds $75,000). *Compare Johnson v. Costco Wholesale,* 1999 WL 740690 (E.D.Pa.,1999) (applying a more stringent test requiring that the amount in controversy be established to a

"legal certainty"). Suffice it to say, for our convenience, we choose to apply the more lenient and easily understood preponderance of the evidence standard at this juncture. Even so, it is doubtful that the "legal certainty" standard would change our result since punitive damages are alleged to punish Home Depot, a multi-billion dollar company, and since the legal sufficiency of Plaintiff's claims is not assessed during amount in controversy determination. *Suber,* 104 F.3d at 583. That is, we might just as easily say "to a legal certainty" that the value of Plaintiff's claims at the time of removal exceeded $75,000.

**13.** Recall footnote 3, *supra.*

108. Plaintiff also contends that she "sustained damage to her reputation as a result of newspaper articles" printed about Home Depot's prosecution and the instant suit. Complaint at 7, 11, 13. However, in response to questions from Defendant Home Depot's attorney at her deposition, Plaintiff could not name anyone in whose esteem she was reduced by Home Depot's prosecution. Plaintiff's Depo. at 150:7–18, 152:4–157:12.

 Calculating damages for mental anguish and hurt feelings, like all pain and suffering damages, can be a "highly subjective task." *Haines v. Raven Arms,* 536 Pa. 452, 458, 640 A.2d 367 (1994). Nonetheless, such damages remain compensatory in nature, i.e. designed to make Plaintiff whole, and "may not be arbitrary, speculative, or punitive." *Id.* Avoiding speculation is especially difficult, where, as here, Plaintiff provides no evidence of physical injury or other medical bills (e.g. for psychological counseling) stemming from the events. However, the case law is clear that physical injury and medical bills are not necessary to sustain such compensatory damages in a malicious prosecution case. *See,* e.g., *Shelton v. Evans,* 292 Pa.Super. 228, 233–234, 437 A.2d 18 (Pa.Super.1981). In *Shelton,* the plaintiff had actual damages of only $500, reflecting the cost of defending himself against criminal charges. *Id.* at 233, 437 A.2d 18. Yet, the court upheld a compensatory damages award of $20,000 for the plaintiff's intangible injuries. *Id.* at 234–235, 437 A.2d 18. The *Shelton* case was more extreme than the instant case, in that the *Shelton* plaintiff was arrested at his home, in front of his wife, and almost went to jail. *Id.* Plaintiff Hayfield was not arrested. Yet, many of the *Shelton* facts are parallel to ours:

It must have been a nightmare, for he knew he had committed no crime.

Moreover, he testified that he had never been arrested before, nor had any criminal charge ever been preferred against him. .... The jury evidently decided that it had before it an honest, sensitive man, who had suffered a great deal. We cannot say that its decision [to award compensatory damages] was unreasonable. What hurts more than an unjust accusation? What is more shameful than stealing from a friend? Of course, some experiences are more painful than these. Still, the jury's translation of appellee's pain into $20,000 does not seem so unsupported that we must set it aside. *Shelton,* 292 Pa.Super. at 234, 437 A.2d 18.

Plaintiff's deposition gives ample evidence that her situation was like that in *Shelton,* in that Home Depot's prosecution was unlike anything she had experienced previously and therefore shook her to her foundations, causing her a great deal of fear, stress and emotional upset. *See* Plaintiff's Depo. at 103:14–104:3 (for three months between arrival of summons and Plaintiff's criminal hearing the matter drove her "a little crazy," she was "upset constantly" and is still "extremely upset over this."); 109:18–112:1 (she continues to experience fear of repercussions); 122:9–123:16 (the stress caused Plaintiff difficulty concentrating at work); 141:23–143:8 (Plaintiff, a private person, "was very, very, very, very, very upset" by the newspaper articles); 151:17–152:3 (Plaintiff cries a lot more often in conversations with her friends); 95:11–96:13, 197:1–25 (Plaintiff was on the phone crying to the District Justice's office and to a Home Depot executive).

Following *Shelton,* we feel Plaintiff may be entitled to substantial compensatory damages. It is for the trier of fact to determine if any such damages are awarded and how much. *Bezerra v. National*

*R.R. Passenger Corp.,* 760 A.2d 56, 62 (Pa.Super.2000); *Bloom v. W.C.A.B. (Keystone Pretzel Bakery),* 677 A.2d 1314, 1319 (Pa.Cmwlth.1996). It is clear to us, however, that Plaintiff's compensatory losses, which appear to be primarily based upon subjective pain and suffering, are to a legal certainty substantially less than $75,000. These would not, in and of themselves, permit her case to be tried in federal court.

▇ Thus, we turn to punitive damages. *Penn,* 116 F.Supp.2d at 570 ("Punitive damages are included in the amount in controversy calculation."). The Third Circuit requires that we give particularly close scrutiny to this brand of relief when it will be the primary basis for conferring jurisdiction in our court. *Meritcare,* 166 F.3d at 222–223 ("Where a claim for punitive damages 'comprises the bulk of the amount in controversy and may have been colorably asserted solely or primarily for the purpose of conferring jurisdiction, that claim should be given particularly close scrutiny.' ") (Internal citations omitted.).[14]

▇ We impose punitive damages for torts committed "willfully, maliciously, or so carelessly as to indicate wanton disregard of the rights of the party injured." *G.J.D. by G.J.D. v. Johnson,* 552 Pa. 169, 172, 713 A.2d 1127 (1998), citing *Thompson v. Swank,* 317 Pa. 158, 159, 176 A. 211, 211 (1934). Whereas Plaintiff claims punitive damages against Home Depot for its intentional tort, she does not claim punitive damages and, by definition, none would be available against Artistic for its merely negligent error or its breach of contract. *See* Complaint at 9, 11, 14; *Moran ex rel. Moran v. G. & W. H. Corson,* 402 Pa.Super. 101, 586 A.2d 416, 423 (1991), citing

Rest.2d of Torts § 500 (punitive damages must involve more than negligence).

Defendant Home Depot is potentially eligible for punitive damages because the company continued to criminally prosecute the Plaintiff, even after it had received payment in full plus a penalty. Plaintiff contends that top Defendant management were aware of or constructively aware of her plight and displayed a wanton disregard of her rights and the effects the prosecution might have upon her. Complaint at pp. 7–8. Plaintiff's check bounced as a result of the printing error by Artistic, in which Plaintiff had no responsibility. Plaintiff's Depo. at 24:9–25. Home Depot admits that Plaintiff's replacement check was cashed but that "as the result of an accounting error" she was nonetheless prosecuted. Home Depot SJ Mot. at 2, 6. Plaintiff's deposition indicates that she took numerous actions to remedy the discrepancy, including calling the store, visiting the store (located an hour from her home) and sending a new check including a $20 penalty. Plaintiff's Depo. at 45:13–16, 45:20–46:5, 47:18–48:12, 48:15–49:19, 50:3–13, 54:3–18, 59:19–60:17, 62:20–63:1, 63:11–67:19, 185:16–185:25. Plaintiff spoke on numerous occasions to, among others, a top Home Depot manager at corporate headquarters, Mickey Davis. *Id.* at 66:20–67:9, 87:11–90:25, 131:5–24, 197:1–25. She begged, even wept on the phone, but the company nonetheless proceeded with its prosecution of Plaintiff. *Id.* Home Depot's attorney admitted in his deposition of Plaintiff that her phone bill reflected these calls. *Id.* at 68:6–14. Thus, Plaintiff has provided ample evidence to sustain a punitive damages claim that Defendant was willful, wanton or

---

**14.** It should be noted with respect to this *Meritcare* holding that inasmuch as Defendant Home Depot was the removing party, we have

no cause to believe that Plaintiff's punitive damages claim was asserted primarily for the purpose of conferring federal jurisdiction.

reckless in its overzealous prosecution of her.

In Pennsylvania, the "function of punitive damages is to deter and punish egregious behavior." *G.J.D.*, 552 Pa. at 172, 713 A.2d 1127, citing *Martin v. Johns–Manville Corp.*, 508 Pa. 154, 169, 494 A.2d 1088, 1096 (1985). It is well-established that the amount required to deter and punish a defendant varies according to the worth of the defendant. *Mathies v. Mazet*, 164 Pa. 580, 30 A. 434 (1894) ("[T]here is a very great difference in a penalty as between a rich man and a poor man. What would be absolutely ruinous to a poor man, worth probably a few hundreds or thousands of dollars, would not amount to anything by way of penalty to a man worth hundreds of thousands of dollars."). The jury must weigh the defendant's wealth with "the character of the act" and "the nature and extent of the harm" when calculating an appropriate punitive damages award. *Kirkbride v. Lisbon Contractors, Inc.*, 521 Pa. 97, 102, 555 A.2d 800 (1989), invoking Section 908(2) of the Restatement (Second) of Torts.

Punitive damages in Pennsylvania need not bear a reasonable relationship to the value of compensatory damages. *Kirkbride*, 521 Pa. at 103–104, 555 A.2d 800. In a case taken up specifically to determine this question, the Supreme Court of Pennsylvania held in *Kirkbride:*

> If the amount of punitive damages must bear a reasonable relationship to the injury suffered, then those damages would not serve as a deterrent. It becomes clear that requiring punitive damages to be reasonably related to compensatory damages would not only usurp the jury's function of weighing the factors set forth in Section 908 of the Restatement (Second) of Torts, but would also prohibit victims of malicious conduct, who fortuitously were not

harmed, from deterring future attacks. *Id.*

The *Kirkbride* court did note that in rare instances, the amount of punitive damages awarded could be so disproportionate as to shock the conscience of the court. *Kirkbride*, 521 Pa. at 104, 555 A.2d 800. *See generally* for a discussion of punitive damages calculation in Pennsylvania after *Kirkbride*, *Friedman v. F.E. Myers Co.*, 710 F.Supp. 118, 122–124 (E.D.Pa.1989) (holding that a punitive damages award 750 times the compensatory damages award shocked the conscience of the court). In the instant case, if Plaintiff recovered, for the sake of argument, $10,000 compensatory damages—a plausible figure—then a punitive damages award of $64,201.53 would place her over the jurisdictional minimum. Such an award would be approximately 6.5 times her compensatory damages, which would not be an excessive ratio as a matter of law even if the "reasonable relationship" test were still in effect in Pennsylvania. *Delahanty v. First Pennsylvania Bank*, 318 Pa.Super. 90, 135, 464 A.2d 1243 (1983).

In *Delahanty*, the First Pennsylvania Bank fraudulently induced the Plaintiffs to enter into the auto leasing business and subsequently sabotaged the Plaintiffs' business by refusing to extend further financing, calling in the loans previously extended, repossessing the cars in inventory and commencing its own competing automobile leasing business. *Delahanty*, 318 Pa.Super. at 101, 464 A.2d 1243. In holding an 11.0 ratio of compensatory to punitive damages ($40,000 compensatory and $440,000 punitive) justifiable under the circumstances, the court observed, "This is a defendant with millions of dollars in assets and who has substantial net equity [sic]. A punitive damages award against this defendant of $5,000.00 or even $10,000.00 would be meaningless. The purpose of a

punitive damage award is to penalize the defendant for its outrageous conduct, not only for the defendant, but for all similar defendants." *Id.* at 135, 464 A.2d 1243.

In the case at bar, Defendant Home Depot has not just millions, but tens of billions of dollars in assets. Clearly a punitive damages award of $10,000 or $20,000 would do nothing to deter Home Depot's policy, and those which may exist among other massive corporations, of unlawfully prosecuting consumers for passing bad checks to project a tough company image or collect outstanding debts—even where such consumers have taken every possible action to rectify the situation. If Plaintiff's version of events is believed by the trier of fact, a penalty of over $65,000 may well be appropriate to send a message to Defendant and other would-be offenders.

Finally, fees and costs are typically excluded from amount in controversy calculations according to 28 U.S.C. § 1332, and are only generally permitted in such calculations "if such fees are available to successful plaintiffs under [a] statutory cause of action." *Suber,* 104 F.3d at 585. Since the case before us involves common law, not statutory claims, we do not consider potential attorney's fees relating to the instant case in the calculation of the amount in controversy.

In conclusion, because of Plaintiff's punitive damages claim against Home Depot, and the aggregation of Artistic and Home Depot as joint actors, Plaintiff's claims against both Defendants more likely than not concern a value exceeding the minimum required $75,000 amount in controversy. We possess jurisdiction to resolve the summary judgment motions before us.

## B. Summary Judgment

The court shall render summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is "material" only if it might affect the outcome of the suit under governing law. *Id.* at 248, 106 S.Ct. 2505, 91 L.Ed.2d 202. All inferences must be drawn, and all doubts resolved, in favor of the non-moving party—in this case, Plaintiff. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Gans v. Mundy,* 762 F.2d 338, 341 (3d Cir.1985), cert. denied, 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985). On motion for summary judgment, the moving party bears the initial burden of identifying those portions of the record that it believes demonstrate the absence of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To defeat summary judgment, the non-moving party must respond with facts of record that contradict the facts identified by the movant and may not rest on mere denials. *Id.* at 321 n. 3, 106 S.Ct. 2548, 91 L.Ed.2d 265 (quoting Fed.R.Civ.P. 56(e)); *see First Nat'l Bank of Pennsylvania v. Lincoln Nat'l Life Ins. Co.,* 824 F.2d 277, 282 (3d Cir.1987). The non-moving party must demonstrate the existence of evidence that would support a jury finding in its favor. *See Anderson,* 477 U.S. at 248–49, 106 S.Ct. 2505.

### 1. Artistic's Motion

 Artistic's motion does not dispute that it sent Plaintiff erroneously printed

checks, but rather, argues that Plaintiff should have checked the account number on her checks before using them. Artistic SJ Brief at 2–3. The motion further suggests that Defendant Home Depot's prosecution was not the foreseeable result of Artistic's mistake. *Id.* at 3–4. In legal terms, Artistic admits negligence and breach of contract but urges consideration of comparative negligence by Plaintiff and co-Defendant Home Depot, disputing whether Plaintiff's damages were proximately caused by Artistic's actions. *Id.* at 5–6, 10. For the reasons stated below, we hold that a trier of fact must determine the extent of Artistic's liability for Plaintiff's damages.

Whether Plaintiff exercised reasonable care in appraising her new checks from Artistic, which contained erroneous information, is a clear question of fact for the jury. *See* e.g., *Seewagen v. Vanderkluet,* 338 Pa.Super. 534, 542, 488 A.2d 21 (1985) (to determine whether appellants should have discovered the defect or had exercised reasonable care are questions of fact). Reasonable jurors may disagree as to whether Plaintiff, inspecting her name and address on the new checks, should have also inspected the account number and thereby discovered the defect.

Artistic would have us find that its conduct in misprinting Plaintiff's checks was so remote from Home Depot's prosecution of Plaintiff that, as a matter of law, Artistic could not be held liable for the subsequent harm. Artistic SJ Brief at 10. We find no decision in Pennsylvania or the Third Circuit concerning liability in negligence and contract for harms to a customer resulting from a misprinted check. We believe, as a matter of first impression, that a negligent check printer can be liable for a plaintiff's pecuniary and non-pecuniary damages resulting from prosecutions which stem from her use of the misprinted

checks, even where she alleges malicious prosecution against the prosecuting party. It is up to the trier of fact to decide whether the check printer's role in the eventual prosecution is too attenuated to establish liability for consequential damages resulting therefrom. We base our decision upon similar cases resolved by other jurisdictions and upon parallel forms of reasoning in Third Circuit and Pennsylvania cases concerning the Uniform Commercial Code section regarding wrongful dishonor of a check by a bank.

In *Morris v. Deluxe Check Printers, Inc.,* the plaintiffs alleged breach of contract and breach of warranty against a check printer that included erroneous routing symbols on the plaintiffs' checks. 395 So.2d 927 (La.App.2d Cir.1981). The court held that assuming the defendant check printer was without fraudulent intent, plaintiffs would be entitled to damages contemplated or reasonably supposed to have entered into the contemplation at the parties at the time of the check printing contract. *Id.* at 931. It was reasonably foreseeable, the court found, that the plaintiffs would not detect an error in routing symbols or numbers and that checks issued by the plaintiffs would be returned unpaid. *Id.* It was therefore also reasonably foreseeable that the plaintiffs would sustain injury to their credit rating; plaintiffs were entitled to damages associated with this injury. *Id.* Likewise, in the case at bar, if the trier of fact were to find that Plaintiff exercised reasonable care in examining her new checks, then she would be entitled under her breach of contract cause of action to pecuniary damages, if any, caused by her bounced checks.

We note that under Pennsylvania's common law of contracts, Plaintiff may not claim emotional distress damages, including mental anguish, humiliation and injury to her feelings. Complaint at p. 11;

*Rodgers v. Nationwide Mut. Ins. Co.*, 344 Pa.Super. 311, 496 A.2d 811, 814 (1985).[15] Plaintiff's Complaint is poorly pleaded in this regard. Nonetheless, the practical effect is minimal because these claims are properly included in Plaintiff's tort negligence cause of action against Artistic.

A Kansas case regarding misprinted checks leads us to consideration of Artistic's argument that it cannot be accountable for Plaintiff's damages because its error did not proximately cause them. In *Citizens State Bank v. Martin*, 227 Kan. 580, 609 P.2d 670 (1980), the court affirmed a summary judgment for the check printer against the plaintiff bank, despite the plaintiff bank's allegations of the printer's negligence and breach of warranty. The plaintiff bank alleged that the check printer's error enabled a bank customer to fraudulently use tens of thousands of dollars in checks, money which the bank lost—two and a half years after the checks were negligently printed. *Id.* at 589, 609 P.2d 670. The court held that the check printer had no knowledge or reason to suspect that the customer was continuing to use the checks to criminal purpose. *Id.* The criminal actions of the bank customer were a superseding cause, which broke the chain of causation and protected the check printer from liability. *Id.* The court opined, "No doubt the vast majority of depositors would not yield to the temptation to take criminal advantage of an error in the bank routing number on their personal checks; doubtless few would appreciate or recognize the potential for such conduct." *Id.*

In Pennsylvania, a superseding cause is one which prevents a defendant's negligence from being a substantial contributing factor in bringing about an event. *Pennsylvania Suggested Standard Civil Jury Instructions*, Pennsylvania Bar Institute, "3.28 (Civ) 'Intervening or Superseding Cause' "at 2, citing Restatement (Second) of Torts § 441(2). In *Ford v. Jeffries*, 474 Pa. 588, 597, 379 A.2d 111 (1977), the Pennsylvania's Supreme Court adopted Section 448 of the Restatement (Second) of Torts, which states:

> The act of a third person in committing an intentional tort or crime is a superseding cause of harm to another resulting therefrom, although the actor's negligent conduct created a situation which afforded an opportunity to the third person to commit such a tort or crime, unless the actor at the time of his negligent conduct realized or should have realized the likelihood that such a situation might be created, and that a third person might avail himself of the opportunity to commit such a tort or crime.

The Pennsylvania Supreme Court has subsequently explained that the questions of whether an event is a substantial factor in the chain of causation and whether "an act is so extraordinary as to constitute a superseding cause" are generally jury questions. *Powell v. Drumheller*, 539 Pa. 484, 490–496, 653 A.2d 619 (1995). Defendant Artistic's arguments (*see* Artistic SJ Brief at 9–10), citing federal case law for the proposition that proximate causation is a question of law for the court, are both incomplete, as to the state of the federal law in this area, and inapposite, since our decision is guided by state law under *Erie*. We will not hold as a matter of law that Home Depot's actions were unforeseeable,

---

**15.** Relying on Restatement of Contracts § 341, employed by Pennsylvania courts, *Rodgers* holds that a plaintiff is not entitled to emotional distress damages based on a contract claim unless the injury includes bodily harm or unless serious emotional disturbance was a particularly likely result. The latter only applies in the event of outrageous conduct by a defendant. Neither of these exceptions applies in the instant case.

in light of Artistic's error. If Artistic's negligent check printing created or increased the risk that Plaintiff would be subjected to a malicious prosecution, and Artistic realized or should have realized the likelihood that such a situation might be created, then the trier of fact may consider Artistic's conduct a substantial factor in producing Plaintiff's harms.

We note that although Plaintiff brings her claims against Artistic under negligence and breach of contract theories, an appropriate analogy exists under the Uniform Commercial Code ("UCC"), 13 Pa. CSA § 4–402(a) and (b), regarding the liability of a bank to its customer for wrongful dishonor of a check. The statute says in relevant part:

> (a) Wrongful dishonor.—Except as otherwise provided in this division, a payor bank wrongfully dishonors an item if it dishonors an item that is properly payable . . . .
>
> (b) Liability of bank.—A payor bank is liable to its customer for damages proximately caused by the wrongful dishonor of an item. Liability is limited to actual damages proved *and may include damages for an arrest or prosecution of the customer or other consequential damages. Whether any consequential damages are proximately caused by the wrongful dishonor is a question of fact to be determined in each case.*

(Emph. supplied.) 13 Pa.CSA § 4–402. *See generally* applying § 4–402, *C & K Petroleum Products, Inc. v. Equibank,* 839 F.2d 188 (3rd Cir.1988); *In Re Brandywine Associates,* 1980 WL 98443 (Bankr. E.D.Pa.1980). For related pre– § 4–402 cases, *see First National Bank of Lock Haven v. Mason,* 95 Pa. 113, 1880 WL 13430 (Pa.1880), *Patterson v. Marine National Bank,* 130 Pa. 419, 18 A. 632 (Pa. 1889), *inter alia.*

The "wrongful dishonor" situation governed by § 4–402 is like the case at bar in that Plaintiff's check was misprinted by Artistic, and therefore not honored, to her detriment, though she had ample funds in her account. Thus, as under § 4–402, a jury may deem foreseeable the damages to Plaintiff resulting from her having been prosecuted.

## 2. Malicious Prosecution

■ Home Depot begins its arguments for summary judgment on Plaintiff's malicious prosecution claim by stating, "In Pennsylvania, cause of action [sic] for malicious prosecution has four (4) elements." Home Depot SJ Brief at 7. Home Depot cites the Pennsylvania Supreme Court's decision in *Kelley v. General Teamsters,* 518 Pa. 517, 544 A.2d 940 (1988) for this proposition. *Id.* The *Kelley* decision states, in relevant part (*id.* at 520–521, 544 A.2d 940),

> A cause of action for malicious prosecution has *three elements.* [Emphasis supplied.] The defendant must have instituted proceedings against the plaintiff 1) without probable cause, 2) with malice, and 3) the proceedings must have terminated in favor of the plaintiff. *Miller v. Pennsylvania R.R. Co.,* 371 Pa. 308, 313, 89 A.2d 809, 811 (1952). It is undisputed that the criminal proceedings underlying this litigation resulted in Ms. Kelley's acquittal. Malice may be inferred from the absence of probable cause. *Hugee v. Pennsylvania R.R. Co.,* 376 Pa. 286, 291, 101 A.2d 740, 743 (1954). Thus, only the first element is at issue in this case.

■ The fourth element Home Depot alleges is a requirement that Plaintiff show "special injury." Home Depot SJ Brief at 10. Defendant cites several cases for this proposition, only one of which, *Lynch v. Johnston,* 76 Pa.Cmwlth. 8, 12, 463 A.2d 87

(1983), makes reference to any sort of "special injury" requirement. As noted above in our discussion of *Erie*, we are not required to follow the lower court *Lynch* case, which we find inconsistent with all other Pennsylvania case law on malicious prosecution. The *Kelley* decision, *inter alia*, makes clear that no special injury element exists in the tort of malicious prosecution in Pennsylvania. *See*, e.g., *Kelley*, 518 Pa. at 520, 544 A.2d 940; *Shelton*, 292 Pa.Super. at 232, 437 A.2d 18; *Neczypor v. Jacobs*, 188 Pa.Super. 25, 28, 146 A.2d 83 (1958).

As we shall see, Home Depot's briefing is the least of its sins in this summary judgment motion, since Defendant is unresponsive throughout to Plaintiff's complaint and seems to deliberately omit harmful facts. Like in *Kelley*, Plaintiff Hayfield's acquittal is undisputed (Home Depot SJ Brief at 9) and malice will be inferrable if Home Depot fails to establish probable cause. Quite unlike the present case, however, in *Kelley*, the defendant had "more than sufficient facts" to establish probable cause for the charged offense before initiating its prosecution. *Kelley*, 518 Pa. at 523, 544 A.2d 940. These included the signed confession of an alleged co-conspirator, who had passed a polygraph test on the matter, reports by an auditor and CPA that the witness who signed the confession did not act alone, and the opinions of the district attorney (who obtained an indictment) and the defendant's legal counsel that probable cause existed. *Id.*

In the instant case, Home Depot had no probable cause for its prosecution. Plaintiff was prosecuted under 18 Pa.C.S.A. § 4105, which states:

(1) A person commits an offense if he issues or passes a check or similar sight order for the payment of money, *know-ing* that it will not be honored by the drawee.

(2) A person commits an offense if he, *knowing* that it will not be honored by the drawee, issues or passes a check or similar sight order for the payment of money when the drawee is located within this Commonwealth. (Emphasis supplied.)

For Home Depot to establish that it had probable cause to believe Plaintiff violated § 4105, Defendant would have to prove that a reasonable person, based on the totality of the circumstances, would have found it more likely than not that Plaintiff knew her check would not be honored. *See Illinois v. Gates*, 462 U.S. 213, 231–238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (setting forth the standard for probable cause). Section 4105 explains how a prosecutor may establish probable cause that the accused possessed knowledge or scienter:

(b) Presumptions.—For the purposes of this section as well as in any prosecution for theft committed by means of a bad check, the following shall apply:

(1) An issuer is presumed to know that the check or order (other than a postdated check or order) would not be paid, if:

(i) payment was refused because the issuer had no such account with the drawee at the time the check or order was issued; or

(ii) payment was refused by the drawee for lack of funds, upon presentation within 30 days after issue, and the issuer failed to make good within ten days after receiving notice of that refusal. Notice of refusal may be given to the issuer orally or in writing by any person. Proof that notice was sent by registered or certified mail, regardless of whether a receipt was requested or returned, to the address printed on the check or, if

none, then to the issuer's last known address, shall raise a presumption that the notice was received.

(2) A check or order stamped "NSF" or "insufficient funds" shall raise a presumption that payment was refused by the drawee for lack of funds.

(3) A check or order stamped "account closed" or "no such account" or "counterfeit" shall raise a presumption that payment was refused by the drawee because the issuer had no such account with the drawee at the time the check or order was issued.

Defendant Home Depot provides a copy of the refused check for $35.28 dated July 13, 1999 (Home Depot SJ Brief at Exhibit D), which gives no indication that Plaintiff lacked an account or funds, as required under § 4105(b)(1). The bank returned Plaintiff's check to Defendant. *Id.* On the face of the check, the bank had stamped several general reasons for which a check may be refused. These included: "NSF," "REFER TO MAKER," "UNCOLLECTED," "ACCT. CLOSED" and "OTHER." *Id.* The bank then manually marked *only* the "REFER TO MAKER" category. *Id.* The category "NSF" was not marked. Had "NSF" been marked, it would have given rise to a presumption under § 4105(b)(2) that Plaintiff lacked sufficient funds. *Id.* Home Depot was on notice that there was no such presumption since it was readily apparent that although "NSF" could have been marked, the bank had made a choice not to mark this category. Because "REFER TO MAKER" was marked, Home Depot was also on notice that it was to contact Plaintiff, the "maker," to discuss the situation.

Defendant's motion makes much of the fact that Home Depot mailed Plaintiff a certified letter notifying her of the dishonored check. *Id.* at 6. The letter was mailed on September 4, 1999. *Id.* at Ex-

hibit C. Defendant then argues that "Plaintiff did not attempt to make good on her check within the ten (10) days provided by the statute." *Id.* at 6. This time restraint was inapplicable, because the bank had given no indication that it refused the check for lack of funds, as discussed above. However, even if this clause of § 4105 were applicable, Defendant acknowledges and provides a copy of the cancelled check it received and successfully cashed nine (9) days after Defendant's certified letter was mailed, on September 13, 1999—representing the very payment which Defendant accused Plaintiff of failing to make. Home Depot SJ Brief at 2, 6, Exhibit G.

Moreover, Plaintiff's deposition, taken as truth on summary judgment, elaborates repeated, even exhaustive efforts to inform Home Depot of the situation, beginning immediately after she learned of Artistic's error and continuing until the time of her criminal hearing. Plaintiff's Depo. at 45:13–16, 45:20–46:5, 47:18–48:12, 48:15–49:19, 50:3–13, 54:3–18, 59:19–60:17, 62:20–63:1, 63:11–67:19, 185:16–185:25. Plaintiff contacted the complaining Home Depot store, speaking with the eventual signer of the criminal complaint, Christina Cunha, long before the complaint was filed. *Id.* at 63:16–64:9; Complaint at p. 6. She spoke many times with Home Depot's headquarters (Plaintiff's Depo. at 66:20–67:9, 87:11–90:25, 131:5–24, 197:1–25) and testified in front of Home Depot's seemingly unqualified representatives at Plaintiff's criminal hearing, who never withdrew the complaint before the ruling and literally laughed in her face. *Id.* at 129:20–130:7, 194:11–195:7.

Responding to Plaintiff, Home Depot's motion contends that its personnel attempted numerous times to call Plaintiff concerning the check. Home Depot SJ Brief at 6. To establish its repeated call-

ing, Home Depot provides its presumptive call log, suggesting calls on various dates to Plaintiff, most of which result in "No Answer." *Id.* at Exhibit H. However, Defendant conspicuously, and we believe disingenuously, omits the second page of its call log, provided along with Plaintiff's response to summary judgment. Plaintiff's SJ Response, appending Defendants' Deposition Exhibit F. The call log states unequivocally, "10–21–99–said she paid." *Id.* In other words, Defendant knew three months before the January 21, 2000 criminal hearing that Plaintiff had paid and nonetheless maintained its action against her.

Defendant's motion further contends that Plaintiff's "phone records demonstrate that she called the wrong store numerous times and the Home Depot personnel there didn't understand her problem." Home Depot SJ Brief at 6 FN4. Home Depot provides a smattering of Plaintiff's phone records to support its contention, but omits key pages showing Plaintiffs numerous calls to the store where she made her purchase in Pennsylvania and to its headquarters in Georgia. *Id.* at Exhibit E. Defendant's attempt to shade the truth with incomplete information is reprehensible.

The *Kelley* court observed, "Usually, the existence of probable cause is a question of law for the court rather than a jury question, but may be submitted to the jury when facts material to the issue of probable cause are in controversy." *Kelley,* 518 Pa. at 521, 544 A.2d 940. Here we need not submit the issue of probable cause to the jury. No reasonable person, under the totality of the circumstances, would believe Plaintiff knowingly attempted to pass a bad check. Indeed, all the evidence points to the opposite conclusion—that Plaintiff did everything in her power to remedy the situation created by Artistic's printing er-

ror. Accordingly, we find that Defendant had no probable cause to initiate and maintain its prosecution against Plaintiff under bad check laws.

 Under *Kelley,* as noted, we infer malice from this lack of probable cause for the sake of establishing the elements necessary to overcome a summary judgment motion. At trial, Plaintiff will be able to establish that Home Depot's prosecution was malicious if she shows that it was initiated "primarily for a purpose other than that of bringing [her] to justice." *Shelton,* 292 Pa.Super. at 233, 437 A.2d 18. If Plaintiff provides evidence that one of Home Depot's reasons for initiating a criminal complaint was debt collection, she will shift to Defendant the burden to prove lack of malice. *Farneth v. Commercial Credit Company,* 313 Pa. 433, 441, 169 A. 89 (1933) ("Nothing is better established than that a criminal prosecution brought for the purpose of collecting a debt is prima facie evidence of a want of probable cause and of malice, and will support an action for malicious prosecution, shifting to the defendant the burden ordinarily on the plaintiff." *MacDonald v. Schroeder,* 214 Pa. 411, 63 A. 1024; *Schofield v. Ferrers,* 47 Pa. 194; *Shields v. Patterson,* 97 Pa.Super. 398; *Edwards v. Stull,* 82 Pa.Super. 456, 1924 WL 3880.). We note ironically that Defendant relies heavily on *Byers v. Ward,* 368 Pa. 416, 422, 84 A.2d 307 (1951) which sent a malicious prosecution case to the jury, citing this precise passage from *Farneth,* establishing that criminal prosecution may not be used for debt collection. *See also Flack v. Johns,* 95 Dauph. 380 (Pa.Com.Pl.1973), *aff'd per curiam* 322 A.2d 674 (Pa.Super.1974) (where malicious prosecution plaintiff offers evidence that one of defendant's purposes is debt collection, burden shifts to defendants to present evidence or risk adverse verdict).

In addition, though we find no case law on point in this jurisdiction, justice and reason dictate that Plaintiff will shift the burden to Defendant at trial if she shows that Home Depot's action was commenced and prolonged to make an example of her, i.e. that Home Depot wanted to show its toughness toward those who write bad checks, though they had no probable cause establishing that Plaintiff herself wrote one. A Kentucky court considering a malicious prosecution case once reasoned eloquently, in logic that would apply with equal force in the case at bar,

> [Defendant] may have had cause to suspect that from time to time thieves were guilty of shoplifting, and there may have been good cause to employ private detectives, and watchmen to apprehend such persons, but the question here is whether or not there was probable cause for believing Mrs. Arnold [the plaintiff] was guilty of such an offense. The mere fact that [the defendant's] employees may have believed that articles of merchandise were from time to time stolen, did not justify them in seeking to make an example of this lady in an effort to deter others from committing the offense. To justify their conduct with reference to this lady, it must appear that she was guilty, or they had probable cause to believe her so. The evidence discloses beyond any question that she was not guilty, and we are of opinion that there was not only want of probable cause, but absolutely no excuse for her arrest. *Stewart Dry Goods Company v. Arnold*, 158 Ky. 241, 245, 164 S.W. 785 (Ky.1914).

The mere fact that Home Depot harbors legitimate concerns about receiving bad checks from customers did not justify its prosecution of Plaintiff, who was innocent.

## IV. CONCLUSION

We find that because Defendants Home Depot and Artistic were joint actors, the claims against them may be aggregated for the purpose of determining the amount in controversy. We find that it is more likely than not that the amount in this action exceeds the jurisdictional minimum of $75,000. Artistic has admitted negligence and breach of contract, and whether Artistic proximately caused Plaintiff's injuries is a matter of fact for the jury. Plaintiff was acquitted of writing a bad check and we find that Home Depot had no probable cause to initiate or maintain suit against Plaintiff. We thereby infer malice for the sake of establishing Plaintiff's prima facie case of malicious prosecution. Accordingly, Defendants' motions for summary judgment are denied and both parties will proceed to trial.

An appropriate order follows.